---

WRAY, EX-PARTE, 30 Miss. Rep., 673.

### HOMICIDE.

All prisoners shall, before conviction, be bailable by sufficient securities, except for capital offenses, where the proof is evident or presumption great.

Bail, in capital cases, is a matter resting in the sound legal discretion of the court; but if the offense is not shown by proof evident, or great presumption, to be such as deserves capital punishment, bail is not a matter of discretion in the court, but of right in the prisoner.

Express malice is, when one, with a sedate, deliberate mind and formed design doth kill another, which formed design is evidenced by external circumstances, discovering that inward intention, as lying in wait, antecedent menaces, former grudges, and concerted schemes to do him some bodily harm. 4 Black Com., 199.

The declarations of a prisoner, made when he obtained weapons for an anticipated difficulty, that he did not intend to use them unless other parties interfered, and the fact that he did not use them until closely pressed by his antagonist and violently beaten, are sufficient to disprove express malice. HANDY, J., *dissented.*

When a well founded doubt can be entertained as to the guilt of the prisoner, the proof is not evident nor the presumption great. HANDY, J., *dissented.*

Error to the judgment of Hon. PHINEAS T. SCRUGGS, Judge

of the Seventh Judicial District, on *habeas corpus*, refusing bail to Jacob K. Wray.

The material facts of the case will be found in the opinion of the court and the dissenting opinion of Mr. Justice HANDY.

*Fontaine & Bradford* and *Harris, Freeman & Goodman*, for plaintiff in error.

*D. C. Glenn*, attorney general.

FISHER, J.:

The petitioner, being in custody, awaiting his trial upon an indictment preferred against him by the grand jury of Pontotoc county, for the murder of one Clarke S. Brown, applied to the judge of the seventh judicial district of this state to be admitted to bail; and the court, after hearing the testimony, as well on behalf of the petitioner as of the prosecution, refused the application, and remanded him to the custody of the sheriff of said county. The object of the writ of error is to revise the judgment thus pronounced.

We have given to the testimony, as shown by the record, a patient consideration; and our minds are forced to the conclusion that under the law which must govern the court in weighing the evidence, the charge of murder, as made by the indictment, can not be sustained, and this settles the question as to the prisoner's right to bail. It is neither required nor proper that we should intimate an opinion, either as to the innocence of the accused, if we entertain it, or as to any degree of manslaughter of which he might be thought guilty. The question is unimportant so far as the present application is concerned, whether the party be wholly innocent, or whether the offense, if falling below the crime of murder, be attended with aggravated circumstances; the result in either case is the same; the party is entitled to his liberty, and the court has nothing to do but to follow the mandate of the constitution on this subject and admit the party to bail, on his giving, in the language of that instrument, good securities. The provision of the constitution is as follows: "That all prisoners shall, before conviction, be bailable by sufficient securities, except for capital offenses, where the proof is evident or the presumption great." The inquiry is, whether the

proof in this case is evident, or the presumption great; that is to say, is the offense, as shown by the whole testimony, one which must, under the law, be capitally punished; for, if so, while a court might, in the exercise of a sound discretion, admit a party to bail, he could not certainly claim it as a right. But if the offense is not shown by evident proof or *great* presumption, to be one for the commission of which the law inflicts capital punishment, bail is not a matter of mere discretion with the court, but of right to the prisoner.

But we will proceed to state, with as little comment as possible on the testimony, the grounds of our opinion. We have seen, that the constitution requires that the proof must be evident, or the presumption great. *Evident proof*, or great presumption, of what? That the offense as shown by the testimony, is one which the law denominates as capital. When is a party committing a homicide guilty of a capital offence? The answer is, when he is prompted by malice to commit the deed;—for without malice there can be no murder; and if in this case there is no murder, there is, of course, within the meaning of the constitution, no capital offense. As no question can arise, under the testimony in this case, as to implied malice, we will inquire whether there is sufficient proof of express malice, or, in other words, whether the proof is evident, or the presumption, arising from the facts and circumstances, great. "Express malice is when one, with a sedate, deliberate mind, and formed design, doth kill another; which formed design is evidenced by external circumstances, discovering that inward intention; as lying in wait, antecedent menaces, former grudges, and concerted schemes to do him some bodily harm." 4 Black. Com., 199. We will now, in a very brief manner, glance at the testimony; keeping in view what has already been intimated, that as little of it as is possible to present the point, will be noticed, or made the subject of comment. Brown, the deceased, was a teacher in the Male Academy at the town of Pontotoc; two of the prisoner's younger brothers were pupils of this school; the younger brother had been, about a week before the killing, whipped by Brown; but this does not appear to have been noticed by the prisoner. About ten o'clock on the day of the killing, which

occurred about twelve o'clock, or a few minutes thereafter, the elder of the two brothers was expelled from the school ; and the prisoner, being informed of what had occurred, applied to one or two persons for weapons ; manifesting at the time, both excitement and distress of mind. He stated, it seems, to all who approached, on this subject, that his object was to seek an explanation from Brown, and that if he had to have a difficulty with him, he should not use his weapons, but that if the school-boys, in the language of the testimony, " pitched in," he would use his weapons in defending himself.

After a conference with the president of the board of trustees, and being told by him that he, the prisoner, could go and see Brown, relative to the expulsion of the brother from the school, he repaired to the school-house and inquired for Mr. Brown. Being informed that he was busy, and could not be seen, the prisoner left a message that he would see Brown on his way to his boarding-house to dinner. School being a few minutes thereafter dismissed, Brown, informed of the message left by the prisoner, started to his boarding-house, travelling his usual path, or road. The parties met on this path—appeared to converse a short time, when the prisoner was heard to use an epithet, and was seen almost at the same moment to strike with his fist about the shoulder of the deceased. The deceased was almost at the same instant seen to draw from his side pocket, what the weight of evidence shows to be a whip, and with it, to strike the prisoner a severe blow on the head, felling him almost to the ground. The prisoner, catching to the clothes of the deceased, recovered from the fall, and commenced backing ; the deceased continuing to use this whip, and to follow up the prisoner. The evidence shows that he backed or retreated about thirty yards before getting out his weapon, with which he inflicted the mortal wounds on the body of the deceased. The testimony shows that the whip, in the hands of a strong man, was a formidable weapon, having in the butt-end about two and a half ounces of lead, covered in the usual way. This is as briefly as it can be stated, the substance of the evidence tending to prove malice.

Let it be conceded, that the fact of procuring weapons, going to the school-house, and waiting on the road, must be regarded

as a circumstance tending to prove malice, if unexplained. But how is the testimony when accompanied by the whole explanation.

1. The declaration of the prisoner at the time of seeking the weapons, that he did not intend to use them on the deceased.

2. He commenced the difficulty by giving a moderate blow with his fist, thus indicating that his declaration was sincere, and consequently there was no sedate, deliberate mind, or formed design, to kill the deceased.

3. No attempt or effort was made to use his weapon in the difficulty, until the resistance had become altogether disproportioned to the assault, and until he was so closely pressed that he may be supposed to have acted as much, or more, from the instinct of man's nature, than from reason, or in carrying out a former design to kill his antagonist. The worst, under the whole evidence, that can be said against the prisoner, is, that a doubt may exist as to the malice; and if a well-founded doubt can even be entertained, then the proof can not be said to be evident nor the presumption great; and if our decision rested alone on this ground—a well-founded doubt—we should feel ourselves compelled to bail the prisoner.

Judgment reserved, and judgment in this court, admitting the prisoner to bail.

HANDY, J. :

Dissenting, as I do, from the opinion of the majority of the court, reversing the decision of the circuit judge in this case, I will proceed to state very briefly the reasons which, I think, lead to the conclusion, that the evidence in the record shows a clear case of murder.

The material facts of the case, as shown by the record, are briefly these :

The deceased was a school-teacher, in conjunction with a gentleman named Fearnster, in the town of Pontotoc, at whose school two of the brothers of the prisoner were pupils. Brown had punished one of the brothers for improper conduct in the school, and the other had resented it, and acted in such a manner, as to destroy the discipline and government of the school.

Upon consultation between the two teachers, it was determined that the case required expulsion, and accordingly, the pupil who had been guilty of the insubordination, was expelled, and he left the school, with great resentment towards Brown. This occurred on Monday morning, the 11th June, shortly after the school met. About ten o'clock of the same morning, the prisoner, an elder brother of the expelled pupil, came to the office of Drs. Fountain and Cain, in the same town, much excited, and wanted to borrow a pistol from Dr. Fountain, who asked him what he wanted with it, and he would not say. He made the same request of Dr. Cain; and when asked by him what he wanted with it, replied : " he would see if he would let him have it," and mentioned the name of Brown in connection with the remark. Shortly after this, he went to the printing-office, and asked for a pistol, much agitated, and mentioning the name of Brown, and muttering something which was not understood by the witness. The witness, Heard, cautioned him to act prudently, and not lay himself liable to the law. He went into another room, where the witness had a bowie-knife and a pistol, and had the latter loaded, and came out, having these weapons upon him. As he came out, he said, that if he had a difficulty with Brown, he would use a stick, and if the boys interfered in Brown's behalf, he would use his weapons, to defend himself; stating, in reply to an offer of a third party, to accompany and assist him in the difficulty, that he did not expect a difficulty. Upon being told, as he came back from the room where he had got the weapons, into the printing-office, that he had better take another pistol, which had been placed there, which was thought to be better than the one he had, he replied, that he was satisfied with what he had. He was next seen talking with Miller, the president of the board of trustees of the academy, who stated that he told the prisoner that he ought to see about his brother's expulsion from the school. Shortly after this, he went to the academy, and called Mr. Fearnster, and was very much agitated, and very angry, and requested to see Brown, in relation to the expulsion. Fearnster advised him to go away, and take time to deliberate and become cool. He urged his request to see Brown, saying that he " *wished to settle the difficulty now.*" Upon being

told that his seeing Brown would interrupt the school, he requested Fearnster to say to Brown, that he " would see him on his way to town or to dinner, when we will settle the difficulty." He then left, and his request was communicated to Brown, who desired Fearnster's advice, as to the course he ought to pursue; but he declined giving any advice, and they both left the academy together, shortly afterwards.

Brown left the academy, and walked on in the path he always walked, in going to his dinner. The prisoner had stationed himself on this path, and when he saw Brown approaching the place where he was, he accosted him, and the first word that was heard was, that the prisoner told him he had been imposing upon his brother. Brown replied, that he had whipped him upon very reasonable cause, and he would leave it to any reasonable man in the town. The prisoner then called him a damned dog. Brown stepped back, and the prisoner struck him with his fist, Brown's hand then hanging down by his side. Brown then took from his coat pocket a small leather whip, of flexible leather, which he was in the habit of wearing in his pocket, with a leathern handle, at the end of which there was lead, of about two ounces, or two and a half ounces weight. The witnesses speak of it as a small whip, and when they saw it in Brown's hand, some of them thought it a hickory withe. Upon receiving the blow, Brown commenced striking the prisoner over the head with the little end of the whip, and the prisoner striking with his fist, Brown continuing to advance upon him and striking him with the whip, and once when Brown struck him, he fell nearly to the ground; and when he got up, he commenced backing, and endeavoring to draw his weapon, Brown continuing to whip him over the head. So soon as the prisoner drew the bowie-knife, he commenced striking Brown with it, and in a short time Brown fell. The knife was about twelve inches long, and the blade seven or eight inches. Brown died very shortly of the wounds inflicted, which were six in number.

Dr. Fountain dressed the wounds of the prisoner, after the fight. He had a contused wound on the side of the head, extending to the bone, about half an inch long, and nearly as wide,

supposed to be made by some blunt instrument; and some bruises on his shoulders and back,—some four or five.

The prisoner is not shown to have had any stick or cane, nor does it appear that there was any interference by the boys, in behalf of Brown.

The question which lies at the foundation of this case is, whether the evidence shows previous malice, on the part of the prisoner.

It seems to be considered by the majority of the court, that in order to constitute malice, it is necessary to show a previous settled purpose, absolutely to take away the life of the deceased, or a threat showing such an intention.

I think such a position wholly unsustained by authority, and unfounded in legal principle.

Malice, which is essential to murder, is defined by Blackstone, to be "any evil design in general, the dictate of a wicked, depraved, and malignant heart," and may exist without any fixed purpose to take the life of the individual. The evidences of this malice towards an individual, are lying in wait, antecedent menaces, former grudges, etc. 4 Black. Com., 199. Roscoe says, "the malice necessary to constitute the crime of murder, is not confined to an intention to take away the life of the deceased, but includes an intent to do any unlawful act which may probably end in depriving the party of life."

Roscoe Crim. Ev., 708, 4th Am. Ed.

Here, it seems to me, there cannot be a reasonable doubt that the prisoner had a previous grudge against the deceased, and that he lay in wait for him; either of which facts would be sufficient to show express malice. Laboring under a feeling of animosity and a desire for revenge for the alleged injury done to his brother, he is diligent in procuring the most deadly weapons—plainly indicating by his declarations, that he intended to seek a difficulty with the deceased. It is most probable that he intended to inflict some corporal punishment upon him, sufficient to disgrace him, and consider that, if submitted to, sufficient revenge for the alleged injury. This is the most favorable construction that can be put upon his conduct. But, if that was his expectation, it is manifest that he did not intend to make the experiment without

being amply prepared, if necessary by a vigorous resistance, to take the life of his antagonist.

It is said that his declarations to Heard and Winston that he did not intend to have a difficulty, (by which, I suppose, it is understood that he did not intend to make an assault upon him with his bowie-knife and pistol, and his declining the proffered aid of Winston, who supposed from his conduct that he was about to enter into such a conflict,) show that he had no idea of provoking a difficulty which would end in the shedding of blood.

But this excuse for his conduct is altogether destroyed by his subsequent conduct. It might possibly have been true that, when he left the printing-office, he merely intended to chastise the deceased with a cane, and not to use his weapons, unless the boys interfered in behalf of the deceased. But his subsequent conduct when he called at the academy, his great excitement, and his declaration to Fearnster that he *wished to settle the difficulty then*, his appointing the place to meet the deceased, his conduct when they met, which altogether excludes the idea that he intended anything else than a personal conflict, and his failure to carry out his intention as declared, to use a stick and not to resort to his weapons, unless compelled by the interference of the pupils—all go clearly to show that he intended to bring on a conflict, and, if necessary by resistance, to use the weapons he had provided himself with against the deceased.

In the case of Green v. The State, it was held by this court that, "if the defendant went into the fight, having upon his person a deadly weapon, intending from the first to use the same, if necessary to enable him to overcome his antagonist, and did, in the fight, use the same and killed his antagonist, he is guilty of murder, although he habitually carried the weapon." Decided at April term, 1854, and not yet reported.

It appears to me that the mind cannot hesitate a moment in saying that all the terms of this rule are filled by the evidence in this case.

I take the rule to be sound and well-established that, whenever a party, having previous malice, provides himself with deadly weapons, intending to use them, if necessary, in a conflict, and he *provokes the conflict*, and uses the weapons, and kills his adver-

sary, it is clearly murder. Roscoe Crim. Ev., 724. Whatever may have been his intention when he left the printing-office as to using the weapons, it is clear that he must have changed it; for he did not use the stick as he there said he intended to do, and his conduct after his visit to the academy is susceptible of no other view than that he then intended to bring on a personal conflict at all hazards, though it might end in blood, for which contingency he was fully prepared.

But, it is said that the killing is extenuated, because, in the conflict, he was hard pressed by the blows of the deceased, and only resorted to his weapon to defend himself against the fierceness of his adversary's blows; that the killing must be regarded as the result of that *furor brevis* produced by the violence of the assault upon him, and cannot be ascribed to the original malicious purpose shown by his conduct.

I dissent *in toto* from this view, and I do not think that a case can be found to support it, when the conflict was provoked by the prisoner, who had provided himself with deadly weapons, to be used, if necessary, except in some cases of mutual combat, and when the parties fight on equal terms; as was the case of the State v. Hill, 4 Dev. & Batt. Eq. Cases, 491. The true doctrine upon the subject is thus stated by Roscoe, 724: "It frequently becomes a most important question in the proof of malice, whether the act was done under the sudden influence of such a degree of provocation as to reduce the crime from murder to manslaughter. The indulgence shown to the *first transport* of passion in these cases, says Mr. Justice Foster, is plainly a condescension to the frailty of the human frame, to the *furor brevis,* which, while the frenzy lasts, renders the man deaf to the voice of reason. The provocation, therefore, which extenuates in the case of homicide, must be something that the man is conscious of, which he feels and resents at the instant the fact which he would extenuate is committed; not what time or accident may afterwards bring to light. Whenever death ensues from sudden transport of passion or heat of blood, *if upon a reasonable provocation* and *without malice*, or if upon a sudden combat, it will be manslaughter; if without such provocation, or, if the blood has had reasonable time or opportunity to cool, or *there be evi-*

*dence of express malice,* it will be murder ; *for, in no instance can a party, killing, alleviate his case by referring to a previous provocation, if it appear by any means that he acted upon express malice. When the provocation is sought by the prisoner, it cannot furnish any defense against the charge of murder.*"

It appears to me that the circumstances of this case bring it fully within the condemnation of these just and salutary rules ; and, that the rule by which this case could be reduced to manslaughter, would be equally unsustained by authority, subversive of the wholesome penal laws of the state, and dangerous in the extreme to the peace and safety of society.

But the killing, in this case, cannot be reduced to manslaughter, even upon the principles applied to cases of mutual combat ; for, in order to lessen the crime of manslaughter in such cases, it must appear that the accused sought or took no unfair advantage. " To save the party making the first assault, upon an insufficient legal provocation, from the guilt of murder, the occasion must not only be sudden, but the party assaulted must be upon an equal footing, in point of defense at least, at the outset." Roscoe, 738. " But," says Mr. Justice Bayley, " if a party enters into a contest dangerously armed, and fights under an undue advantage, though mutual blows pass, it is not manslaughter, but murder." Whiteley's case, 1 Lewin C. C., 173, cited Roscoe 739. And this case falls fully within these rules.

In any view in which this case can be legally regarded, I think the evidence shows a clear and unmitigated case of murder, and that the circuit judge acted properly in refusing bail to the prisoner.