## MOORE v. STATE, 36 Miss. R., 137.

### HOMICIDE.

A prisoner has a right to a writ of error to revise a judgment on habeas corpus refusing him bail.

In determining in this court that a prisoner shall or shall not have bail, the court does not mean to prejudice his case so as to influence a jury who may afterwards try the issue of his guilt. He may be refused bail, and afterwards acquitted; or granted bail, and afterwards convicted of murder.

A jury may, and perhaps ought, in some cases, to find the defendant guilty of murder, even after this court has allowed him bail.

This was a writ of error prosecuted to revise the judgment of the Hon. John Watts, a circuit judge, rendered in an action refusing the prisoner's application for bail.

The substance of the evidence appears to be:

That the prisoner was the owner and keeper of a grocery in Scott county; and that his brother, Benjamin Moore, was employed by him as assistant and clerk. That the deceased (Johnson) lived very near the grocery, about one-quarter of a mile distant, and was in the habit of frequently visiting that place, where he usually got drunk, and when drunk, behaved in a violent and insulting manner towards the Moores and their customers. It was proven that about two weeks before he was killed, Johnson was at the grocery, got drunk, attacked Benjamin Moore violently, seized him by the collar, and endeavored to drag him across the counter of the grocery; and made an effort to cut him with his knife. About this time, Benjamin Moore said to a witness, "that the way Johnson is going on with me will never do, and it has to be dried up,

or he will get killed, and I am the man to do it." B. Moore then showed the witness a knife, and some other weapon, and further told the witness that Johnson had attacked him that evening at the grocery with his knife, as before stated.

On the day of the killing, Johnson (the deceased) came to the grocery in the morning, very soon after breakfast; he soon afterwards got drunk, and became noisy and insulting. He cursed a good deal, and jumped with his feet on an old man who was there, and who had said or done nothing to him. Some of those present interfered, and he threatened to hurt them if they did not desist. He sang a vulgar and obscene song; and old Mr. Moore, the father of the prisoner, requested him to desist. He then commenced cursing and abusing him. Ben. Moore then came up, and Johnson rushed at him, and caught him by the collar. Ben. Moore pushed him off, and told him to "stand off," or he would kill him. Ben. Moore then went off some forty or fifty yards, and sat on a log. His father persuaded him to leave the grocery, and go home. He replied to his father, "that his brother had hired him to attend to his business, and he did not intend to be run off by anybody." It was then proposed by some one present that Ben. Moore and Johnson should make friends. To this Ben. Moore assented, and he and Johnson drank together, and shook hands. Ben. Moore then went out of the grocery, and Johnson began cursing him again, and advanced on him, when B. Moore drew his gun, and told him to "stand off, or he would make him sick." The prisoner and others prevented them from fighting.

The prisoner and one of the witnesses then persuaded Johnson to go home; and he said he would, if the witness would bring him his mare; saying that his mare had taken him out of several "scrapes," and "she had to take him out of another yet." Johnson got on his mare, and started in the direction of his residence; but soon turned and galloped off in a different direction, saying that "he would be d—d if he didn't go and prepare himself, and come back and drive the last Moore from Pea Ridge, or lose his life in the attempt." The prisoner halloed to Johnson "that if he did so, he would arm himself too." The prisoner then went to a neighbor's house near by, and got

a rifle, and was seen at the grocery when he returned, but was not noticed by any of the witnesses afterwards, until just after Johnson was shot, as will be hereafter related. Ben. Moore had a gun during the whole day; and one of the witnesses stated that he had loaded it to shoot at a mark with witness; but it was not proven he so shot it at a mark. After Johnson left, Ben. Moore was noticed by the witnesses in the road in front of the grocery, but it does not appear when he took the position he occupied when he shot Johnson; nor does it appear how long a time intervened between the departure of Johnson and his return. After Johnson left, he was seen by a witness, to whom he said: "I want to kill somebody," and then he rode on towards Moore's grocery. This seems to have been prior to the time he was at a brick-yard not far from Moore's. While at this brick-yard, he asked witness to load a Colt's repeater for him, which was done; he said he wanted to shoot it at a mark, but stated that he had no caps. Two witnesses for the state passed the brick-yard just before the killing, and saw Johnson sitting down, with his head resting on his hands. These witnesses were going in the direction of Moore's grocery; and soon after they passed the brick-yard, Johnson galloped up to them, and asked one of them where in the h——l he was going; he said "he was in a difficulty down yonder." He drew a Colt's repeater from his side, held it up, and showed it to the witness. About this time, the witness and Johnson came to a neighborhood road, which led from the main road to Johnson's house, and witness persuaded Johnson to take that road and go home. He refused to go, and held up his pistol, and asked witness if he thought he was a coward; said he would give him two dollars for a box of caps, and asked witness if he had any. (From this point to the fork of a main road, and the road leading to Johnson's house, to Moore's grocery, is one-quarter of a mile, and about the same distance to Johnson's residence, and also about that distance from Johnson's to Moore's by another road; so that it is twice as far from the fork to Johnson's by the route by the grocery as by the road there leading off to Johnson's.) The two witnesses and Johnson then proceeded in the direction of Moore's; the witnesses walk-

ing, and Johnson riding. When they arrived in sight of the grocery, about one hundred and thirty yards from it, a gun fired in the direction of the grocery, and Johnson complained of being shot. The witness helped Johnson from his mare, and he saw Ben. Moore between them and the grocery, near the roadside. He was about sixty yards from the grocery, and about seventy from the witnesses. He was not concealed; the woods were open, and the trees had been "deadened." Soon afterwards he got in the road and loaded his gun. "Very soon after the gun fired," one of the witnesses "saw the prisoner run into the road nearly opposite to where Ben. Moore stood;" the prisoner came running up to where witness and Johnson were; he raised his rifle, and told witness to stand out of the way, or he would shoot him; witness got out of the way, and as he approached Johnson, the latter told him that he (Johnson) was already shot enough, and requested him not to shoot him. Prisoner immediately turned around and walked towards the grocery. Soon afterwards, as witness was passing the grocery on his way home, the prisoner requested him to go back with him to the place where Johnson was, and see if anything could be done for Johnson; witness and prisoner went up the road and found Johnson's saddle, and not seeing him, they supposed he had gone home, and they went no further. This witness, on cross-examination, stated that when he saw prisoner come into the road, after the shooting, his (prisoner's) back was towards the grocery.

Another witness for the state stated that he was about one hundred yards from the grocery, in an opposite direction from Johnson, when he heard the gun fired; that the house did not intercept his view, and he saw Johnson put his hand to his body when he was shot. "At the same time he saw the prisoner go towards the place (where Johnson was); he had some children with him."

It was proven by witnesses for the prisoner that the prisoner went to see Johnson after he was shot, and lying a short distance from the road, under a tree. The prisoner's manner to Johnson was kind. He gave him his hand, saying "he had nothing against him, 'but a brother is a brother.'" Prisoner

asked Johnson if he should send for his wife. Johnson assented, and prisoner procured one of the witnesses to go after her.

It was proven by two witnesses for the state that, on the succeeding night (Johnson being dead), the prisoner came to the house where the dead body was, and said: "It was a bad business, but, as it had to be, he was glad it occurred as it did; and that he would like to know the man who loaned the pistol."

Several witnesses who were present at the grocery when Johnson left, a short time before he was shot, as before related, stated that his manner was violent, that they anticipated he would return armed, and that there would be shooting, and, therefore, they left.

Ben. Moore was proven to be about twenty-one years old, and sickly and very weak. Numerous witnesses, including most of those who testified for the state, concurred in the opinion that Johnson, when drunk, was a dangerous, reckless, and desperate man, and anxious and willing to fight with deadly weapons. Some of the witnesses related instances in which he exhibited his overbearing disposition by making unprovoked and violent attacks on persons in his company. It was also proven that, on the day he was killed, he asked a witness, who was about to leave the neighborhood, to take a drink with him, saying "that he never expected to see him again, as he anticipated that he would either kill somebody or be killed before Christmas."

It was also shown that the prisoner had very little property, and was in bad health, which would be further endangered by confinement in prison.

The circuit judge refused bail to the prisoner, and he sued out this writ of error.

*T. P. Ware*, for plaintiff in error.

*T. J. Wharton*, attorney general.

HARRIS, J.:

This case was presented to us originally on a petition for a writ of error, to revise the judgment of the circuit judge in vacation, refusing to allow the defendant bail, the late act of the legislature having made the writ of error in criminal cases, in

this respect, a writ of right. The case is now submitted to us on the error assigned.

On examination of the evidence in the cause, now appearing on the record, we think it perhaps most consistent with the liberal policy of our Constitution and laws to allow this application for bail. We refrain from any comment on the testimony, or the expression of any opinion as to the guilt of the accused, or the degree of the offense. We do not intend to intimate an opinion that he may not be guilty of murder, or that he may not be wholly innocent. This will be the province of the jury who shall hear the evidence. We wish it understood that, on application for bail, we may grant the application even in cases where a jury might and perhaps ought, on the same evidence, to render a verdict of guilty of murder.[1] So much depends on the incidents of a trial by jury, the manner of the witnesses, their intelligence, their seeming bias or fairness, that cannot be brought before this court, which yet should have a material bearing on the weight of evidence, that we deem it unsafe that the opinion of the high court in granting or refusing bail should be adopted as a criterion for the jury by which to determine the guilt or innocence of the accused.

Let the judgment below be reversed, and the defendant admitted to bail, upon his entering into recognizance himself in the sum of two thousand dollars, with two good securities jointly and severally in a like sum, to be entered into before the sheriff of Rankin county, Mississippi. This sum is fixed by this court, upon proof of the insolvency of the prisoner.

[1] This case, together with the cases of Wray and Beall, are fully considered in the opinion of the court in the case of Street v. State, where the doctrine above laid down is overruled. See 43 Miss. R., 1.