## BEALL *v.* STATE, 39 Miss. R., 715.

### HOMICIDE—BAIL.

Under the liberal principles of our constitution and laws, in cases of homicide, bail should be granted, even in cases where the jury might, and perhaps ought, on the same evidence, to render a verdict of guilty of murder. Moore v. State, 36 Miss. 137, cited and reaffirmed.

Error to the judgment of Hon. J. S. YERGER, Judge of the third judicial district, in refusing bail to Thomas T. Beall, the plaintiff in error.

It appears from the record that Dr. Thomas T. Beall, the plaintiff in error, was indicted both for the murder of Dr. Selser and Mr. Griffin; that he had been once tried, before suing out the writ of *habeas corpus*, on the indictment for the murder of Selser, and that the jury had been discharged on account of their being unable to agree.

It appears from the evidence that both Selser and Griffin were killed in a rencounter with Beall, on the night of the 28th of May, 1860. Dr. Pettit, who was examined on behalf of

Beall, testified that Selser and Griffin were brothers-in-law. Beall had been in the habit of visiting the house and family of Selser, in the village of Warrenton, where they both resided. The witness, some weeks previous to the killing, had of his motion told Beall that his visits to Selser's were unpleasant to the ladies there, and Beall replied that he could take a hint. On Saturday morning, the 26th of May, 1860, two days before the killing, Selser called on witness, and asked him to say to Beall "that his (Beall's) visits to his house had been frequent, and annoying to his family and visitors, and that he would have to ask him to come there no more." This message was communicated to Beall that evening, and a short time afterwards Beall called on witness, and told him that he had called on Mrs. R. (a sister of Dr. Selser, residing with him), and asked her if she had authorized the message, and that she had said that she did authorize it. In the conversation witness advised Beall "to drop it," and he seemed disposed to take his advice. On the next morning, Beall called on witness, and asked him to say to Dr. Selser "that the whole thing was so contemptible, he would take no further notice of him or his family." Witness endeavored to dissuade Beall from sending the message, but told Beall if he insisted, he, witness, would consent to carry the message. Witness and Beall then had a lengthy conversation about Dr. Selser's feelings towards Beall. Witness said to Beall that Selser's feelings were friendly towards him. Beall asked witness if Selser had authorized him to say so. Witness said he had not, but had told witness of his feelings. Beall asked witness to go to Dr. Selser and get from him an authorized statement to that effect, which witness declined to do. He then said if witness would not go he would try to get some one else, and that it might be several days before witness heard from him. Some time after this conversation Beall called on witness and authorized him to carry the following message: "That I received it with a feeling of profound contempt, and hurled it back on them just as it was sent. My dignity and self-respect as a gentleman forbid my taking any further notice of it one way or the other." Witness asked Beall whom he meant by the word "them" in the message. He said it included the ladies of the

family. Witness conveyed the message to Dr. Selser. On Monday morning witness asked Beall to write the message for his convenience; that there was something about it Dr. Selser said he did not understand, and he wanted to know who was meant by the word "them." Beall then wrote the message as follows: "Considering the terms of the message, and the circumstances under which it was sent, I received it with a feeling of profound contempt, and hurled it back on them just as it was sent. My dignity and self-respect as a gentleman forbid my taking any further notice of it one way or the other." Witness took the message as written to Dr. Selser's house. Mr. Griffin, one of the deceased, was there, and said the message could be misunderstood, and advised Dr. Selser to see Dr. Beall. Selser said he would see Beall, and ask an explanation about the meaning of the word "*them*."

In the conversation witness had with Beall on Sunday, witness said that Dr. Selser was responsible for the conduct of his sister. Beall said he did not want to hold him responsible or shoot him for what his sister had done. Witness told Beall that there was nothing insulting in the message sent by Dr. Selser, and that it was not intended to insult him, and that he ought not to be surprised at it. When Beall wrote the message, he said he did not want any difficulty with Dr. Selser, but would be prepared for one. He also asked witness how Dr. Selser received the message. Witness told him he did not know.

On Monday night, 28th of May, there was some sort of public exhibition on a "show-boat," then landed at Warrenton, and there was also what is called a "side-show," in a tent pitched on the bank of the river, near the show-boat. The moon shone, and there were also torches on the bank, which enabled parties to see what was going on. Dr. Selser, Mr. Griffin, Mr. Barnes, a brother-in-law of Dr. Selser, Mr. Bedford, and Mr. Vernon, intimate friends of Selser, were all at the show together. They all went to the show together, except Vernon, who went to accompany them, but being too late, he came on with his wife after them. All these parties were armed, except Barnes. Griffin and Selser each had bowie-knives; the others had pistols.

Barnes, Bedford and Vernon were all examined for the state, and from their evidence it appeared that the matter of the message sent by Beall to Selser had been discussed at Selser's house that morning previous to going to the show, and that Selser had determined to ask for an explanation of Beall the first time he met him.   Some of these witnesses acknowledged that it was expected that Selser would meet Beall at the show, but they all denied that they were armed for the purpose of taking part in any difficulty that might ensue, or that they were present with Selser and Griffin for that purpose.   They represented that Selser had determined to seek an explanation in a friendly manner, and if it was refused, and Beall attacked him, that he would then knock him down.   One of these witnesses confessed that he had advised Selser to have his right hand on his weapon during the contemplated interview, and to use his left hand in case he struck Beall.   All the parties, being accompanied by several ladies, went first on the boat, and soon afterwards Beall arrived.   Nothing was said or done on the boat calculated to produce a rupture, but in a short time the parties left the boat.   Griffin and Beall went into the side-show in the tent.   The others awaited on the outside together.   As soon as Beall came out of the tent Selser advanced towards him, and they approached near together about the time Beall reached the top of the levee, Selser having not quite reached the top.   Selser asked Beall, in a quiet and unexcited tone of voice, what he meant by the message he had sent him.   Beall said, "What message?"   Selser said, "The message you sent me by ——," and at this moment Beall sprang at him, striking him in the breast.   But after Selser accosted Beall, and before any blow was given, some one touched him on the arm, and he immediately changed his position so as to get on the top of the levee, on the same level with Beall; as soon as Beall came from the tent, and Selser started towards him, Barnes stated in a loud voice, "Do not let us go too close.   Dr. Beall may think we intend to double-team on him, and some one may cry foul play."   At the time Beall struck Selser, the latter had his hands on his hips, a position in which he usually carried them. Immediately on the striking of Selser by Beall a short struggle

ensued between them, which ended in Selser's falling down, and Beall falling upon him. Before Selser fell, and after he was struck, he said, "Beall has a knife;" and Beall replied, "Have you not one, too?" About that time Griffin stepped up, and said, "Do not interfere; let them have a fair fight." Soon after Beall and Selser fell, Griffin and one of Selser's friends took hold of Beall. As soon as Beall arose, a conflict ensued between him and Griffin. One of the witnesses heard steel clashing between them, and very shortly after, Griffin called for a pistol, stating that Beall had killed Selser, and probably himself. Vernon then attempted to shoot Beall, but was prevented by the intervening crowd. In this conflict both Selser and Griffin received mortal wounds from a dirk-knife used by Beall. Selser died immediately, and Griffin in a few hours afterwards. Griffin was wounded in two places—in the right side and one of his arms. Selser had four wounds on his body —one (mortal) just above the breast-bone on the lower part of the neck—the others were slight. Beall had a wound on his left shoulder from one to one and a half inches in width, and two or three inches deep; also a small wound on his left fore-finger, and a slight wound on the thigh. They appeared to have been made with a knife. A medical witness (Dr. Brick-well), who examined the wounds on Beall, was of the opinion that the wound on the shoulder came somewhat from above; if it had been otherwise, the wound would have inclined out-wards, as if he stood with his back to the party striking. If Griffin and Beall had been advancing from face to face, this wound could not have been inflicted, unless the party inflicting it was on the left side of Dr. Beall, and a little behind him.

The only weapons seen by any of the witnesses during the affray, was a bowie-knife in the hands of Griffin, and a pistol in the hands of Vernon, when he attempted to shoot Beall after the fight had ensued. A bowie or dirk-knife was found on the body of Selser after his death; it was in a scabbard, which was attached to the inside of his pants; no other weapon was found on his body.

At the time Selser accosted Beall, he had on a linen duster coat, which was buttoned from his chin to his knees.

A witness examined for the defense said, when he saw Selser accost Beall, he, witness, changed his position so as to get out of the range of Selser. Several witnesses were introduced for defendant who testified that Vernon had made statements, soon after the killing, contradictory to his testimony. The material points on which he was contradicted are, that he stated to three witnesses that Selser had determined to meet Beall and demand an explanation of the message, and if he failed to make a satisfactory explanation, that Selser had said that he would knock him down; to another witness he stated, that he, Vernon, had tried to persuade Selser, from the time they started, not to attack Beall, and as they went on Selser agreed not to attack Beall, but on walking further, he said he would attack Beall, but in a gentlemanly way, and if he did not give a satisfactory explanation he would knock him down. To another witness he stated, that Dr. Selser had called on him (Vernon), Griffin and Barnes, to be present when he demanded an explanation of Beall.

A witness for the defendant stated that he had gone to Bedford on the boat during the show, and asked him to prevent a difficulty between Selser and Beall, and Bedford stated he had tried, but that Selser was mad and could not be prevailed on to do it; that when he is mad he could do nothing with him.

It was proven that Selser was a stout, courageous man, about five feet eleven inches high, taller and stouter than Beall. It was also proven that the ladies who were with Selser's party at the show on the boat did not go into the tent show, but went home before the affray commenced. Beall was proven by many witnesses to be a quiet, peaceful, and well-behaved man.

The circuit judge refused bail to the prisoner, and he sued out this writ of error.

*D. O. Merwin* and *F. Anderson*, for plaintiff in error,

Insisted, even if the court should consider it a clear case of murder, that under the authority of Wray's case, 30 Miss. R., and Moore's case, 36 ib., there was a discretion to grant bail, and the circumstances of this case fully warranted the exercise of this discretion in behalf of the prisoner.

They also went into a critical and elaborate examination of the testimony, insisting that it did not make out a case of murder, and that the prisoner, therefore, was entitled to bail.

*T. J. Wharton*, attorney general.

HARRIS, J. :

The plaintiff in error prosecutes this writ of error to reverse the judgment of the circuit judge, refusing him bail on writ of habeas corpus.

The record shows that the plaintiff in error is confined in the jail of Warren county under two indictments for murder, originating out of the same transaction. The record further shows that the plaintiff in error was tried on one of said indictments in the circuit court of Warren county, before a jury, which resulted in the discharge of the jury, because they were unable to agree on a verdict.

After a careful examination of the cases presented to us in this record, we have determined that bail should have been allowed the plaintiff in error in both cases.

The grounds of our judgment we deem it proper to withhold, as the cases are to undergo examination before a court and jury, whose province it will be to determine upon the guilt or innocence of the accused.

We again repeat what was said by this court in Moore v. The State, 36 Miss. R., 142, that "we wish it understood that on applications for bail we may grant the application, even in cases where the jury might, and perhaps ought, on the same evidence, to render a verdict of guilty for murder. So much depends on the incidents of a trial by jury, the manner of the witnesses, their intelligence, their seeming bias or fairness, that cannot be brought before this court, which yet should have a material bearing on the weight of evidence, that we deem it unsafe that the opinion of the High Court in granting or refusing bail should be adopted as a criterion for the jury, by which to determine the guilt or innocence of the accused." In the case before us, we do not intend to intimate any opinion as to the guilt or innocence of the party accused.

Let the judgment be reversed, and the defendant admitted to

bail, upon his entering into recognizance before the sheriff of Warren county, Mississippi, himself in the sum of ten thousand dollars, with two good securities, jointly and severally in a like sum, in each case.

HANDY, J., dissented from so much of this opinion as reversed the judgment and admitted the plaintiff in error to bail.