*Ex parte* Jones S. Hamilton and *Ex parte* L. Mims Eubanks.

1. Habeas Corpus. *Relator charged with murder. Question of bail. Case in judgment.*

H. and E. being in custody, jointly charged with the murder of G., sued out, severally, writs of *habeas corpus* before Chancellor P., who, after hearing the cases, refused the relators bail and remanded them to jail. Whereupon, they appealed to the Supreme Court and submitted their cases together. *Held*, by the majority of this court, that the facts established by the evidence show that H., seeing his opportunity to confront his enemy alone, attacked and killed G., unaided by any other person, but upon no sufficient provocation in law; and, hence, upon the rules of law applicable to bail, (and which are well settled by former adjudications in this State,) E. should have been allowed to give bail, or been discharged, and bail was properly denied to H.

2. Same. *Bail for capital offenses. § 8, Art. I., Constitution, construed.*

Section 8, Article I., State Constitution, declares that ["excessive bail shall not be required; and all persons shall, before conviction, be bailable by sufficient sureties, except for capital offenses, where the proof is evident, or the presumption great." This language means, in reference to capital offenses, that, for them, bail before conviction is a matter of constitutional right, and cannot be properly denied, any more for that class of offenses than for those not capital, except when the proof is of such nature as to leave no well founded doubt of the guilt of the prisoner. Per *Arnold J.*, dissenting.

3. Same. *When bail is not a matter of right. Exceptional circumstances.*

In capital offenses, where the proof leaves no reasonable doubt as to the guilt of the prisoner, bail as a matter of right is denied by law, and can be rightfully granted only in exceptional and extraordinary circumstances, such as protracted and unusual delay on the part of the State in bringing the prisoner to trial, or such as are likely to seriously or fatally affect the health of the prisoner by reason of imprisonment and the denial of bail. *Ex parte* Bridewell, 57 Miss., 39, and *Ex parte* Pattison, 56 Miss., 161, cited. Per *Arnold, J.*, dissenting.

4. Same. *Bail for capital offense. Reasonable doubt as to guilt.*

Where there is a well founded or reasonable doubt of the guilt of a prisoner, it cannot be said that the proof is evident or the presumption great of his guilt, and where, upon the evidence, there is a probability of the prisoner's innocence, there must be (as it has been several times declared

in this State) a reasonable doubt of his guilt.  *Ex parte* Wray, 30 Miss., 673; *Ex parte* Bridewell, 57 Miss., 39; *Nelms* v. *State*, 58 Miss., 362; *Nixon* v. *State*, 55 Miss., 525; and *Browning* v. *State*, 30 Miss., 656, cited. Per *Arnold, J.*, dissenting.

5.  SAME.  *Policy as to bail.*

It was expressly announced in *Moore* v. *State*, 36 Miss., 137, that the policy of the constitution and laws of this State in regard to bail is liberal, and that policy has not been, and should not be, changed.  Per *Arnold, J.*, dissenting.

6.  SAME.  *Practice as to bail.  Weight of judgment of trial judge as to facts.*

The judicial officer who hears an application for bail is the trier of the facts and must determine, on his own judgment and conscience, whether the evidence, under the law warrants bail or not; but, in doing so, he is governed by the established rules of law.  And this Court, when called upon to review a judgment denying bail, is governed by the same rules of law which control the action of the officer below, giving to his judgment, however, the *prima facie* presumption of correctness which attaches to the judgments of all courts of competent jurisdiction, and recognizing the advantage which he enjoyed in determining the credibility of witnesses by seeing and hearing them testify.  The weight to be ascribed by the apellate court to such judgment must depend on the circumstances of each case; but when, as in this case, the theory upon which the prosecution of the appellant has been conducted and upon which the judgment below was based is rejected by this court, but little importance should be accorded the conclusion of the trial judge as to the facts of the case.  Per *Arnold, J.*, dissenting.

7.  SAME.  *Bail improperly denied.  Law applied to facts proven.*

Upon the facts established in the hearing before the Chancellor, above referred to, E. should have been discharged and is, of course, entitled to a reversal of the judgment against him.  And the evidence as to H. being such as, at least, to produce well founded and reasonable doubt of his guilt, he is, upon well settled principles of law, applied to the facts proven, entitled to a reversal of the judgment denying him bail.  Per *Arnold, J.*, dissenting.

APPEAL from the decision of HON. E. G. PEYTON, chancellor of the ninth judicial district, on *habeas corpus.*

At about 10 o'clock on the night of the 5th of May, 1887, many persons residing near by, or being in the vicinity by chance, were attracted to the iron bridge over " town creek " on

Capital Street, in the city of Jackson, by a startling discharge of fire-arms. These persons, upon arriving at the bridge, found Roderick D. Gambrell speechless and dying, from the effects of three pistol shot wounds, in the knee, body and head, respectively, and many blows upon the head; they found there also Jones S. Hamilton wounded by pistol balls in two places in the arm and one in the body, who avowed himself to be the slayer of Gambrell.

On the 8th day of May, 1887, J. B. Gambrell made an affidavit before W. H. Harris, a justice of the peace, charging Jones S. Hamilton, L. Mims Eubanks, W. H. Figures, J. W. Albrecht and Bill Hardy, jointly, with the murder of Roderick D. Gambrell. The justice of the peace issued two bench warrants for the persons named, and on the next day they were all arrested. Eubanks, Figures, Albrecht and Hardy were confined in the county jail; Hamilton was permitted to remain at his residence, under guard, because of his wounds.

On the 9th of May, 1887, Eubanks and the other persons arrested as above stated, except Hamilton, applied severally for writs of *habeas corpus*. The writ prayed for by Eubanks (as well as the writs applied for by the others) was issued returnable to the 16th of May, 1887; and on that day the sheriff brought Eubanks (and the other relators) before the chancellor.

The chancellor immediately proceeded to hear testimony on the charge against Eubanks (and the others accused), but had not concluded the hearing on the 7th of June, 1887, when Jones S. Hamilton filed his petition for a writ of *habeas corpus*, which was issued returnable "*instanter*," and was returned on the day of its issuance.

Some additional evidence was adduced after the return of the writ in Hamilton's case; and on the 9th of June, 1887, argument was commenced in the several cases of Hamilton, Eubanks, Albrecht, Figures and Hardy, considered together.

The argument after continuing through several days was concluded on the 13th of June, 1887; the chancellor rendered a final decree or judgment directing that Figures and Hardy be discharged from custody; that Albrecht be allowed to give bail, and that Hamilton and Eubanks be returned to jail without

the privilege of giving bail.    From this judgment or decree Hamilton and Eubanks appealed.

It was proven that both Gambrell and Hamilton were at the railroad depot in Jackson, though not together, a short time before the homicide. Each left the depot some minutes before the killing, going east on Capitol street towards the iron bridge, the course pursued being the way to their respective homes. Gambrell was walking and alone; Hamilton, accompanied by Eubanks, was riding in a wagonette, or small covered wagon, with a door for ingress and egress at the rear, which was driven by Hardy. Gambrell and Hamilton reached the iron bridge, a few hundred yards distant from the depot, and there took place the shooting which resulted as stated above. Whether the former or the latter arrived first at the scene of the tragedy was a question in controversy in the trial below. The initial demonstration of hostility and all the acts constituting the fatal transaction, the identity and number of the actors or participants therein, as well as the circumstantial and pointing facts attending the homicide, were matters controverted between the State and the accused by a voluminous array of testimony on either side.

The evidence for the State was directed to establishing a conspiracy of Hamilton, Eubanks, Hardy, Albrecht and Figures to take the life of Gambrell, or the participation with Hamilton, of some one or more of the others mentioned in a premeditated and unprovoked attack upon, and killing of, Gambrell. The evidence in behalf of the relators was based upon the theory that Hamilton, while riding in his wagonette or " little red wagon," with no hostile purpose, and without any aggressive demonstration on his part, was attacked by Gambrell firing a pistol shot at him ; to repel which attack, Hamilton jumped to the bridge, through the door of his vehicle, which sped away with the other occupants, and unaided, in single combat, slew his assailant.

A great deal of evidence was presented in support of each of the opposing theories. Some of it was positive testimony to the transaction of the homicide or to a certain act or acts thereof ; much more was circumstantial evidence ; and there was not a little touching the character and reputation of the deceased and those charged with taking his life, respectively, and

the relations previously existing between the one and the others. This evidence was furnished by some eye-witnesses, many ear-witnesses, a few experts and a considerable number of physical, inanimate objects, such as pine splinters shattered from a post by a pressing bullet, pistol balls, pistols, articles of clothing, the little red wagon, and maps or diagrams of the scene of the tragedy. And the bridge and its surroundings were inspected by the chancellor, under an agreement of opposing counsel, and in company with them.

The reporter does not undertake to state as a fact, proven or disproven by the evidence, any matter which was the subject of controversy in the lower forum. As to all such matters, there was an irreconcilable conflict between the evidence for the State and that for the relators, out of which facts can be legally evolved only by a process of reasoning involving analysis, synthesis, comparison, weighing and study, applied to the testimony and the witnesses, and which pertains to the judicial functions, or by the exercise of the uniquely exalted, unquestionable, theoretically infallable powers of a petit jury. Of the results to be reached by the former method there are three illustrations in this case. The chancellor's conclusions as to the facts established by the evidence are indicated by his decision hereinbefore stated. The opinion of the two justices composing the majority of this court shows that they differ widely from the chancellor in their views of the evidence. And the dissenting opinion of the other justice manifests a material disagreement with his colleagues. If a determination by the other method alluded to, the verdict of a jury, could be here inserted it might present still another solution of the questions of fact here involved. For the reporter, in this state of case, to set forth as a fact any proposition asserted either for the State or the relators, and disputed by the other, or others, would simply be an unfair, if not an extra-official, expression of his personal views of the evidence. To present the evidence in full would fill this volume ; and to give a part of it only would necessarily be unsatisfactory and serve no purpose. It is thought, too, that the statement here given will suffice, as nearly as practicable, to preface the opinions herein-after following.

65 Miss.—11.

It having been agreed by counsel in this court that the cases of Hamilton and Eubanks should be presented, considered and decided together, the foregoing statement has accordingly blended them.

The statements made above as to the charge against Albrecht, Figures and Hardy, their arrest, the proceedings of *habeas corpus* prosecuted by them, and the disposition thereof by the chancellor, were not and could not have been obtained from the records sent up to this court in the two cases under consideration, but are believed to be substantially correct, and are deemed to be proper, as constituting a part of the history of the cases under review, and as called for by references in the opinions here following.

*Nugent & McWillie, Calhoon & Green, W. P. Harris* and *H. Cassedy*, for the appellants.

*T. M. Miller*, Attorney-General, and *Brame & Alexander* for the State.

Counsel on both sides filed lengthy briefs, respectively, discussing the weight and effect of the evidence.

*W. L. Nugent*, of counsel for the appellants, made an oral argument.

*T. M. Miller*, Attorney-General, and *L. Brame*, for the State, made oral arguments.

CAMPBELL, J., delivered the opinion of the Court.

The record is very voluminous, and contains much incompetent evidence. The task we have attempted to accomplish is to eliminate from the case all incompetent evidence, and looking alone to that which is competent to decide the question: Were the prisoners entitled to be bailed on the legal evidence before the chancellor?

Any discussion of the rules of law applicable to bail is idle, because not a single question is open in this State; all have been settled by former adjudications, and are familiar learning, and any difference of opinion among lawyers now must be not as to aw, but the facts of a case.

We forbear to comment on the facts further than to say that they have failed to convince us that any person besides

Hamilton participated in the killing of Gambrell, and they have convinced us that Hamilton, acting on provocation insufficient in law, but such as has often incited to deeds of violence, saw his opportunity to confront his adversary alone, and got out of his wagon and killed him.

We reject alike the theory of the prosecution (as to the participation of several in the killing), and of the defence (as to an attack having been made on Hamilton in his carriage), and believe the above mentioned view to be a just inference from the established facts. From which it results that Eubanks should have been bailed or discharged, and that bail was properly denied to Hamilton. Wherefore the judgment as to Eubanks is reversed and vacated, and as to Hamilton it is affirmed.

Arnold, J., dissenting.

I concur in the opinion of the majority of the court, in so far as it reverses the judgment as to Eubanks; but dissent, with entire confidence in the correctness of my conclusion, in so far as it affirms the judgment as to Hamilton. On the record before us, Eubanks, in my judgment, should have been discharged by the Chancellor, as innocent of the crime charged, and if it were not for the fact that since the trial below he has been indicted, and that a prisoner held under indictment may be bailed, but cannot be unconditionally discharged on *habeas corpus*, I should unhesitatingly vote to discharge him.

In considering an application for bail before conviction, I am admonished by authority and cannot forget that the object of arrest and imprisonment, prior to conviction, is not to punish the accused; but to insure his forthcoming to abide trial and the punishment that may be inflicted upon him by the sentence of the law, after conviction (Church on *Habeas Corpus*, Section 401). Nor can I divest myself of the grateful reflection that, in a land of freedom, it is not until after conviction that the law assumes the aspects of terror, and exacts unconditionally the forfeiture of life, liberty or property. The fabled system of criminal practice which inflicted punishment first, and awarded trial afterwards, may have been consistent with the principles administered by the court of Rhadamanthus and his associates,

located as it was; but such doctrine has no recognition in the polity of Christian or civilized people. The laws which establish and regulate the right to bail are not doubtful or uncertain in this State. Art. I, Sec. 8, of the Constitution is, that "Excessive bail shall not be required; and all persons shall, before conviction, be bailable by sufficient sureties, except for capital offences, when the proof is evident, or the presumption great." The simple and unambiguous language of this provision can mean nothing more nor less than that for all offences not capital, bail before conviction is a right of which no person can be lawfully deprived, no matter what the proof of his guilt may be. And in reference to capital offences, it can mean nothing else than that for them bail before conviction is equally a matter of right also, except where the proof of guilt is evident or the presumption great; or in other words, that for capital offences before conviction bail is an unqualified constitutional right, and can be properly denied no more for that class of offences than it can be for offences not capital, except when the proof is of such nature as to leave no well-founded or reasonable doubt of the guilt of the prisoner.

In capital offences, when the proof leaves no reasonable doubt as to the guilt of the prisoner, bail, as a matter of right, is denied by law, and can be rightfully granted only in exceptional and extraordinary circumstances, such as protracted and unusual delay on the part of the State in bringing the prisoner to trial, or such as have or are likely to seriously or fatally affect the health of the prisoner. The just and humane policy of the law is that, before conviction, even in capital cases when the proof is evident or the presumption great, the life of a prisoner shall not be destroyed, nor his health permanently impaired by imprisonment and the denial of bail; nor shall he be held without bail when his constitutional right to a speedy trial has been wantonly, oppressively or unreasonably abridged. But bail should not be granted on account of slight sickness, or the danger, suffering or inconvenience commonly incident to imprisonment; nor for delays in the prosecution which are necessary to afford the State reasonable opportunity to prosecute fairly. *Ex parte Bridewell*, 57 Miss. 39; *Ex parte Pattison*, 56 Miss. 161.

If anything said in *Moore* v. *The State*, 36 Miss. 137, and in *Beall* v. *The State*, 39 Miss. 715, enlarged the right to bail beyond what I have stated, it was appropriately qualified in *Ex parte Bridewell*, supra.

It was declared in *Ex parte Wray*, 30 Miss. 673, and in *Ex parte Bridewell*, 57 Miss. 39, that when there is a well-founded or reasonable doubt of the guilt of a prisoner, it cannot be said that the proof is evident or the presumption great of his guilt; and it is a well approved doctrine in this State that where, upon the evidence, there is a probability of the prisoner's innocence, there must be a reasonable doubt of his guilt. *Nelms* v. *The State*, 58 Miss. 362; *Mixon* v. *The State*, 55 Miss. 525; *Browning* v. *The State*, 30 Miss. 656.

The policy of the constitution and laws of Mississippi in regard to bail is liberal, and was expressly characterized as such by Judge Harris, speaking for the High Court of Errors and Appeals, in *Moore* v. *The State*, 36 Miss. 137. If this policy has been changed, or if there is any reason why it should be changed at this day, I am not advised of it. The constitution on the subject is the same now that it was then, and no such change has been wrought by statute or any decision of this court; and if there is any decision of this court which can be properly construed by anybody to have such effect, I do not, I cannot, and I will not subscribe to it.

Such is the law of the land as I understand it, and it is applicable, without fear, favor or affection to all alike.

The judicial officer who hears an application for bail is the trier of the facts, and must determine on his own judgment and conscience whether the testimony, under the law, warrants bail or not; but in doing so he is governed by the established rules of law such as I have stated. A matter of so much importance, and capable of becoming a source of so much vexation and oppression, is not, and should not be, left to the mere caprice or will or pleasure of any court or any officer.

When called upon here to review a judgment denying bail, we are governed by the same rules of law which control the action of the officer below. We accord to his judgment the *prima facie* presumption of correctness which attaches to the judgment of

all courts of competent jurisdiction, and place a proper estimate on the advantages which he enjoyed for determining the credibility of witnesses by seeing and hearing them testify; but what weight shall be ascribed by the appellate court to such judgment must depend on the circumstances of each case. There is no cast-iron rule on the subject. It is certain that there are several cases in this State in which bail was denied below on the facts, and which were afterwards reversed on appeal, and bail granted him, on the same facts, and facts quite as strong against the prisoner, it seems to me, as those in the case before us. It seems to me that we can properly attach but little importance, in the case at bar, to the conclusion of the chancellor as to the facts; for our unanimous opinion, reversing the judgment as to Eubanks, explodes, as far as our judgment can do so, the theory of conspiracy, and of more persons than Hamilton and Gambrell being engaged in the tragedy, upon which the prosecution has been conducted, and upon which the judgment of the chancellor was evidently based.

Rejecting then, as we all do, the theory of the State as to how the homicide occurred, it becomes vital to the ends of justice to know how the fatal difficulty commenced on the bridge? What was the first demonstration made, and by whom? What was the first thing said or done on the meeting of the two armed and hostile men, under circumstances in which the slightest movement on the part of the one would have been accepted as a tocsin of war by the other?

There are, in addition to physical facts, several eye witnesses to the transaction, whose testimony on these points, if credited, relieves Hamilton from criminalty, and I cannot say that it was impossible for the facts to have occurred to which they testify. There is, to say the least of it, such uncertainty as to produce well founded and reasonable doubt, in my judgment, and I am bound, under the law, to resolve such doubt in favor of the prisoner.

The trial below being conducted on the conspiracy theory, manifestly enlarged the scope of investigation and testimony, greatly to the disadvantage of Hamilton; and it seems to me, that common justice and fairness appeal in his favor for another

hearing for his liberty, on the merits of the case, disconnected from the burdens, which we all believe were unjustly imposed upon him in the trial below. To disregard such considerations may be lawful, but it cannot be just. Entertaining these views of the law and the facts, it is my opinion that on settled principles the judgment should be reversed as to Hamilton, as well as to Eubanks.