# THE STATE v. ABRAM.

1. A Court organized under the act of 1832, "to provide for the speedy trial of slaves and free persons of color," ceases to possess the power to proceed further in the case submitted to it after it has tried the accused and pronounced the judgment of acquittal or condemnation; consequently if its judgment is erroneous, and reversed by a higher Court, the case should not be *remanded*, but if further proceedings are proper, it should be tried *de novo*.

2. When one of the Justices of the Peace composing a Court, organized under the act of 1832, for the trial of slaves, withdraws from the bench after the trial is entered upon, and his place is supplied by another, and for that cause a judgment of condemnation is reversed, the prisoner cannot be said to have been in jeopardy, and he may be tried again; and this although the judgment of reversal does not award a *venire facias de novo*.

3. The act of 1832, in providing a tribunal for the trial of slaves, &c. does not exclude the jurisdiction of the Circuit Court in such cases, which is conferred by the constitution itself.

The prisoner, a slave of Daniel Long, was indicted at the Circuit Court of Dallas, holden in 1842, for the murder of Reuben, a slave of the same master. To the indictment he pleaded in abatement, that on the 23d of August 1841, he was tried for the offence charged in the indictment by a special Court, composed of the Judge of the County Court and two Justices of the Peace of Dallas, and found guilty, upon which conviction he obtained a *certiorari*, and caused the proceedings to be removed to the Circuit Court, where the verdict and judgment of the special Court was reversed; and further, there has been no other trial of him by the special court; wherefore he prays that the indictment may be quashed. This plea was adjudged bad on demurrer; and thereupon the prisoner pleaded—1. Not guilty. 2. Autrefois acquit.

On the trial certain questions of law were reserved by the presiding Judge, and the prisoner being found guilty and sentenced to death, the same are referred to this Court as novel and difficult. It appears from the reference that the prisoner was tried and convicted as alledged in his second plea; that that conviction was, on the 5th November, 1841, reversed by the Circuit Court of Dallas, on the ground that the special

Court permitted one of the Justices of the Peace after the trial had commenced, to withdraw from the Bench, and another to take his place. The judgment also directed the prisoner to be remanded to custody, until discharged by due course of law. It was shown that the offence charged was committed previous to the time when the act of the 9th January, 1841, "regulating punishments under the penitentiary system," became operative, and the case had never been sent back for trial to the special Court. Upon this evidence the prisoner's counsel moved the Court to charge the jury—

1. That as the prisoner had not been returned to the position he occupied when the error was committed by the special Court, and could not be so returned, he was in law discharged and should be acquitted.

2 That as the cause had not been remanded, nor the prisoner discharged by the Circuit Court, the right to try him pertained to the special Court by which he was first tried—that Court not being abolished as to his case.

R. Saffold, with whom was G. W. Gayle, for the prisoner, contended that the Circuit Court erred in sustaining the demurrer to the plea in abatement. The prisoner, if subject to trial, should have been tried before the special Court which first tried him; that Court continued, and the statement there made against him, (which was but the substitute for a formal indictment,) never having been adjudged insufficient, should have been thence remanded, if further proceedings were contemplated. [The State v. Hughes, 2 Ala. Rep. 105; Arch. Crim. Plead. 87.]

The offence was committed and proceeded against by the special Court before the act "regulating punishments under the penitentiary system," took effect, and before the law authorizing such a Court was repealed; and its jurisdiction could not be interfered with. [2 Stew. & Por. Rep. 9, 15.] But even the special Court could not have proceeded against the prisoner, because the cause was not remanded and a *venire facias de novo* awarded. [Aik. Dig. 256; 5 Cow. Rep. 608; 1 Caine's Rep. 586; 2 S. & P. Rep. 9, 15.]

The Circuit Court should have given the first charge prayed. [State v. Ned, 7 Porter's Rep. 187.] The prisoner was tried by a Court on an indictment different from that on which

35

he was first tried; besides, the law as modified required that two thirds, instead of one half, the jury should be slave-holders.

The manner of the proceedings in this case, up to the time of the finding of the indictment in the Circuit Court, was such as to entitle the prisoner to his discharge, and his trial was consequently unauthorized. [2 Sumner's Rep. 38; 6 Sergt. & R. Rep. 577; 1 Hayw. Rep. 241; 1 Dev. Rep. 491; 9 Wheat. Rep. 579; 8 Wend. Rep. 549; see Ned v. The State, 7 Porter's Rep. 187.]

The ATTORNEY GENERAL, for the State—

1. The question is not whether the judgment of the special Court was properly reversed by the Circuit Court. If necessary, the legal conclusion will be in favor of its reversal.

2. The act creating the special Court did not originate a tribunal of exclusive jurisdiction, but one which, to the extent of its powers, acted concurrently with the Circuit Court. [Ned v. The State, 7 Porter's Rep. 187.]

3. The judgment of reversal did not entitle the prisoner to his discharge; and the case could not have been remanded, for the special Court ceased to exist so soon as it adjourned after the trial.

4. The judgment of reversal assumes that by the withdrawal of one of the Justices of the special Court, that Court was *ipso facto* dissolved, and it is insisted the substitution of another Justice, and the subsequent proceedings were unauthorized and did not put in jeopardy the life of the prisoner. Had the Court ceased its operation after the Justice withdrew, the case would have assimilated itself to that of Nugent v. The State, 4 Stew. & P. Rep. 78; see also The State v. Hughes, 2 Ala. Rep. 106, N. S.

COLLIER, C. J.—It may be well to premise that independently of any legislation upon the subject, this Court, in virtue of its constitutional powers, was competent to award a writ of error to bring up for revision the proceedings in a criminal cause in which the accused had been convicted. [Lynes v. The State, 5 Porter's Rep. 236.] In cases of *treason and felony* it was grantable at discretion, and in misdemeanors *ex de-*

*bito justitiæ.* The law in this respect, has been so far modified by the second section of the thirteenth chapter of the act of 1841, "regulating punishments under the penitentiary system," as to authorize any one of the Judges of this Court, when it is not in session to award the writ; and in all cases without reference to the grade of the offence, it is to be granted at the discretion of the Judge or Court. By the first section of the chapter, the Judge presiding on the trial of a criminal case is authorized to refer novel and difficult questions of law to this Court for its decision, in the same manner as was provided by the previous enactment.

Anterior to the act of 1841, it was the settled practice of this Court, never to reverse a judgment where a case was referred to us, unless the error was shown by the points reserved. That statute it is conceived does not effect such a change in the law as to warrant a departure from a practice coeval with the State government. If the record discovers errors, which the order of reference does not bring to our view, the correct course of procedure is, to ask for a writ of error, that they may be adjudicated.

In the present case the prisoner's counsel has admitted that at least one of the points discussed by him is not presented by the order of reference, and though we cannot give him the benefit of it in the judgment we are to render, yet we will consider it, that it may be seen whether it should be reviewed on error.

Addressing ourselves to the case we will inquire—1. Whether the charge against the prisoner should, upon the reversal of the judgment by the Circuit Court, have been remanded to the special Court (as it is designated,) before which he was tried?

2. Did not the reversal of the judgment by the Circuit Court entitle the prisoner to a discharge, not only from the charge preferred before the special Court, but from all further prosecution?

3. Had the Circuit Court primary jurisdiction of the case of a slave charged with a capital offence previous to the act of 1841, and could it take jurisdiction under the circumstances?

By the act of 1832, " to provide for the speedy trial of slaves and free persons of color," [Aik. Dig. 124,] it is enacted that the Judge of the County Court of every county in this State,

together with two Justices of the Peace to be associated with him, or in case there should be no Judge of the County Court, then any three Justices of the Peace shall constitute a Court for the trial of all slaves and free persons of color charged with any crime or misdemeanor of a higher grade than petit larceny. *Further,* whenever a slave or free person of color shall be brought before a Justice of the Peace, charged with the commission of such an offence, if after examining the witnesses for the prosecution, the Justice shall believe that there exists any probable ground of the guilt of the accused, he shall immediately commit him or her to jail, and shall at the same time issue a notice to the Judge of the County Court of his county, and also some Justice of the Peace, which notice shall be served, &c. informing them of such commitment, and state the time and place of trial, &c.; and the Justice who shall make the commitment and the Judge of the County Court, or if there be no Judge of the County Court, two Justices of the Peace thus summoned, shall form a Court to try and determine the offence. The act also provides other matters preparatory to the trial, as well as the proceedings thereon, and invests the Court with power to pronounce the sentence of the law consequent upon a conviction. The Court authorized by this statute to be formed as it is limited in its powers is also temporary or ephemeral in its existence; its being ceases with the occasion which gave to it life. When it has tried the accused and pronounced the judgment of acquittal or condemnation the purpose for which it was convened is consummated, and its authority necessarily at an end. The law does not contemplate it as a permanent Court, but as an association of magistrates acting under a special commission, deputed *pro hac vice* to perform extraordinary judicial powers; and when the duty confided to them has been discharged, even erroneously, they take their ordinary official stations, and can't act unitedly again in the trial of the accused, without a new commission.

In this view of the special Court it follows that the Circuit Court could not have remanded the case of the prisoner, and that the order made upon the reversal of the judgment was entirely regular, unless he was entitled to a discharge.

2. In considering the second point we will assume, that the judgment of the special Court was erroneous, and was there-

fore rightfully reversed. The inquiry then is, could the prisoner be again put upon his trial?

It is insisted that his life was put in jeopardy by the trial in the special Court, and that the constitutional provision declaring that "No person shall, for the same offence, be twice put in jeopardy of life or limb," which is affirmative of the common law, operated as a bar to all further proceedings against him. This argument is attempted to be sustained by the case of Ned v. The State, [7 Porter's Rep. 187, and the cases there cited.] In that case the Court say, "If by a reversal of the judgment the prisoner could be placed in the same position which he occupied when the error was committed, we might say in accordance with the adjudicated cases, that his life had never been at hazard; but in the present case, we never can return the prisoner to that stage of the case at which the error intervened." There the jury to whom was committed the case of the prisoner were discharged by the Court merely upon their representation that there was no reasonable probability that they could agree upon a verdict. Now it was obvious that a jury entertaining in all respects the same opinion of the evidence and controlled by similar influences, could not again be selected; hence it was holden, that as the accused might be irreparably prejudiced by their causeless discharge, he could not be further proceeded against. But the same reason will not apply to a Judge who withdraws from the Bench pending a criminal trial. The law is stable and certain, though differently understood and expounded by different judicial officers; and it is always the same, no matter by whom administered. It is then entirely competent to place the prisoner precisely in the same situation in which he was when a Justice of the special Court withdrew. He certainly could not be placed in a situation less favorable to an acquittal, as is clearly indicated by the verdict then rendered. The case cited, instead of being an authority for a reversal of the judgment of the Circuit Court, seems to us imperiously to require its affirmance. The very elaborate examination there given to the constitutional provision, and the extended review of the cases touching the principle of the common law, which it affirms, renders it unnecessary for us now to go over the same ground. It may be added, however, that if the case cited was out of the way, the cases of The

State v. Williams, [3 Stew. Rep. 454,] The State v. Hughes, [2 Ala. Rep. 106,] and The State v. Lore, at this term, [*ante.* 173,] would show that the prisoner was not entitled to a discharge.

3. In respect to the third question, it may be remarked that if a judgment pronounced upon a conviction be falsified or reversed, all former proceedings are absolutely set aside, but the party convicted remains liable to be prosecuted another time for the same offence. [Stephens' Crim. Law, 332; 1 Chit. Crim. Law, 750; People v. Casbours, 13 John. Rep. 351; 3 Phil. Ev. C. & H ed. 826, and cases there cited; ib. 952-4.] This being the law, the failure of the Circuit Court to award a *venire facias de novo* upon rendering the judgment of reversal can have no influence upon the subsequent proceedings.

The sixth section of the fifth article of the constitution provides, " The Circuit Court shall have original jurisdiction in all matters, civil and criminal, within this State, not otherwise excepted in this constitution; but in civil cases only when the matter or sum in controversy exceeds fifty dollars." The language here employed is too explicit to allow it to be seriously questioned whether the Circuit Court is competent to entertain jurisdiction of a capital offence committed by a slave. But if it were even doubtful, the question could not now be regarded as *res integra.* In the first case that was brought here after the passage of the law providing for the special Court, although no opinion was filed, this Court stated that the statute was cumulative and slaves were subject to be prosecuted in the Circuit Court as previously. The correctness of that decision has never been drawn in question, but has been repeatedly acted on, and will not now be disturbed.

We have considered this case with the sincerest desire to confine ourselves within the limits of the strictest rules, perhaps with too strong a desire to infuse into the administration of justice an undue measure of mercy; and our firm conviction is, that consistently with the law we cannot prolong the prisoner's existence. We have only to announce that the judgment of the Circuit Court is affirmed.