PRICE *v.* STATE, 36 Miss. R., 531.

### ASSAULT AND BATTERY WITH INTENT TO KILL.

Where a person prepares and conceals a deadly weapon, before entering into a fight which he provoked, with the determinaion of using it, if necessary, in the fight, it is evidence of malice, which, if he kill his antagonist, would constitute murder. Roscoe Cr. Ev., 738 ; Rex v. Kessal, 1 C. & P., 437 ; 2 Archb. Cr. Pl. and Ev., 224-1.

"If a party enters into a contest dangerously armed, and fights under an undue advantage, though mutual blows pass, and kills his adversary, it is not manslaughter but murder." Per BAILEY, J., in Whitley's case, 1 Lew. C. C., 173 ; Rosc. Cr. Ev., 739 ; Archb. Cr. Pl. & Ev., 224.

The verdict of the jury, in cases of felony, must be delivered in open court, and in the presence of the defendant. But if the defendant is absent from the court, as his own voluntary act, he cannot take advantage of his absence. His voluntary absence must be taken as a waiver of his right to be present. Hence, though the verdict is irregular in this respect, he cannot take the benefit of his own illegal act.

The power to discharge the jury is a matter within the sound discretion of the court, to be exercised whenever the ends of public justice require it ; and such discharge will not bar a subsequent trial and conviction. Hence, where, at a former term, the jury disagreed, and were discharged by the court, it is no ground of error.

The constitutional rule, that no person shall be twice put in jeopardy of life or limb for the same offense, means that he shall not be again tried for the same offense, after he has been once convicted or acquitted.

Where the reasons and circumstances upon which the court discharged the jury do not appear, it will be that it was done legally.

Instructions are not a part of the record ; and unless they are embodied in a bill of exceptions, they will not be noticed on error.

Error to Pike circuit court. McNAIR, J.

William Price, the plaintiff in error, was indicted and convicted in the court below, of an assault and battery on one Judge M. Hart, with intent to kill and murder said Hart. He made a motion for a new trial, on the following grounds :

"1st. Because the verdict is contrary to law and evidence.

"2d. Because the court erred in giving the following instruction, viz. : 'Malice, in its legal sense, means a wrongful act done intentionally, without just cause or excuse.'

"3d. Because the court erred in putting defendant's witnesses under the rule.

"4th. Because the verdict of the jury was returned into court while the defendant was absent, and the jury were discharged before the defendant had an opportunity of polling them."

He also moved an arrest of judgment—

1st. Because the verdict was returned during his absence.

2d. Because the court, at the last March term, discharged the jury when there was no necessity, and against the consent of defendant.

Both of these motions were overruled, and the defendant tendered his bill of exceptions, which contains the evidence introduced on the trial of the indictment, and sets out the above motions, and the evidence introduced on the hearing of said motions.

On the trial of the indictment,

Judge M. Hart, the prosecutor, testified for the state, that on the night of the 31st of December, A. D. 1857, he, with others, were at William Brown's, at a ball or party; that he and others had been requested by Mr. Brown to see that order and proper decorum were observed; and about dark the prisoner and some others arrived; and after being in the house a short time, the prisoner and others commenced "shuffling on the floor as if dancing." J. E. J. Hart (a brother of witness), and one of the persons appointed to see that order was kept, called the prisoner and one Hodges out of the room. Witness heard his brother (J. E. J. Hart) call him three times. After waiting a little, he went out into the yard, where J. E. J. Hart and Hodges were engaged in a quarrel. Hart was stripped to the shirt. Just as witness entered the crowd he heard some person say, "By God, Hodges, I am here." Witness supposed it was the prisoner that spoke, and witness turned to him and said, "Price, I thought you were more of a gentleman than to act as you are, or have acted, in shuffling over the floor, using bad language, and getting in the way of those engaged in the dance." Price replied, "What have I done?" Witness again repeated in substance what he had just stated. Price denied it. Witness then remarked to him, "Go into the house and get you a partner, and act or dance like a gentleman." Price said he had not acted ungentlemanly. Witness insisted that his conduct was wrong; and Price then remarked, "That witness could not whip him." Witness replied, "As to whipping him, he could do it faster than Price could get up." Price then stepped up to witness, and said to him: "You are a d——d liar; and if you think you can whip me, pitch in." Witness stepped back so as to get room to strike, and struck Price, knocking him back some distance. At that time some person pulled witness' coat-tail. As soon as the blow was given, witness advanced, and was met by Price, when the fight was resumed by witness and commenced by Price, both parties striking about the same time. Price struck "overhanded," and with the first blow cut witness on the right side of the face. Witness saw no knife in the hands of Price. They fought for some

time before they were separated. After being separated, witness discovered that he was wounded twice in the arm, two small marks on the neck, and a large wound on the face; witness' coat, pants, and vest were cut in several places.

Joseph E. J. Hart, for the state, testified that he was at the party at Brown's, and was, with others, requested by Brown to see that order was kept. Shortly after the dancing commenced. Price and others came in, and some of them commenced shuffling or dancing about the fire-place. Witness requested Price to walk out into the yard. They went out; and whilst he and Price were talking, Hodges came out, and about that time a quarrel commenced between witness and Hodges. Witness pulled off his coat for the purpose of fighting Hodges, and about that time McLendon told witness he was too large to fight Hodges, and to try him. Witness then called his brother, Judge M. Hart, asking him to come out and try and make peace. After Judge M. Hart came out, "he and Price got into high words;" but witness does not recollect what was said; but he recollects that Price called Judge M. Hart a d——d liar, and told him if he thought he could whip him to pitch in. Hart then struck Price, and at that time he observed that Price had his right hand in his bosom. Witness saw nothing more of the fight until about the time they were parted, when he observed Hart was bleeding from the cut on the right side of his face, as though his throat had been cut.

Cross-examined.—Witness did not strike or kick Price during the fight, nor did Judge M. Hart, immediately after the fight, accuse witness of being the cause of it.

Judge A. Hart, for the state.—Witness is a son of J. E. J. Hart, and nephew of Judge M. Hart. He was at the party at Brown's. Shortly after Judge M. Hart came from the house into the yard where Price and others were standing, he and Price got into a quarrel; and whilst thus quarreling, witness (who was standing behind Judge M. Hart) saw Price take out a black-handled knife, open it, and "put it into his side-pocket in his coat, or some place in his clothes about his breast." During the quarrel Price stated to Judge M. Hart that he (Hart) "was a d——d liar, and if he thought he could whip

him to pitch in." As Judge M. Hart was about striking, witness caught him by the coat-tail and tried to hold him back, and he told those standing around that Price had a knife; but there was so much noise, he supposes no one heard him. No one interfered in the fight so far as witness saw. After the fight was over, witness saw a knife that was picked up by Mr. Prestridge, but he does not know to whom it belonged.

Samuel Prestridge, for the state.—After the fight had ceased, he found a large pocket-knife, which was exhibited on the trial. Witness would call the knife a deadly weapon. There was some blood on it when found by witness, and the point was bent, as if it had been struck against a hard substance. Hart was severely cut on the right cheek; there were also some cuts on his arm, entering to the bone, and a scratch or two upon his neck; his clothes were also cut in several places.

Wilson Price, for the state.—About three weeks before the fight, he saw in the possession of the prisoner a knife, " of the kind and description of the one found by Prestridge after the close of the fight." He further stated that neither the prisoner nor Hodges nor the McLendons were invited to the party at Brown's.

For the defendant.—Laban Moke testified that he was at Brown's at the party. Saw Price in the room after the dancing commenced and when it was going on; saw him " do nothing out of the way;" " heard him make use of no improper language." Witness was in the room all the time Price was there, and saw him go out with J. E. J. Hart. About the time they left, Hodges also left. As soon as Hodges and J. E. J. Hart met in the yard a quarrel ensued between them. Hart pulled off his coat; and in a short time called three times for his brother, Judge M. Hart. When Judge M. Hart came out, he and Price and witness all met together. Hart commenced on Price, by accusing him of acting ungentlemanly in the room where the dance was going on. Price denied it; and Hart insisted that his conduct was bad. Price then remarked: " Judge, you cannot whip me." Hart replied: " As to whipping you, Bill Price, God d—n you, I can whip you faster than you can get up, or knock you down faster than you can get up."

To which Price replied: "You are a d——d liar, and if you think so, pitch in." Hart stepped back and struck Price, and knocked him back eight or ten feet. The parties then advanced, clenched, and fought for some time, and until they were separated. When the quarrel and fight commenced, witness was standing between Hart and Price, and near enough to put his hand on either of them. He saw no knife, and no attempt to draw a knife. Saw Hart immediately after the fight, and he was severely wounded. Witness is a justice of the peace, and friendly to both parties.

James McLendon, for the prisoner, stated that he was at Brown's party, and in the house when the dance was going on, and whilst Price and Hodges were in the room. "Saw Price do nothing wrong." Witness went out about the time J. E. J. Hart and Price went out. After J. E. J. Hart and Hodges commenced quarreling, witness told his brother, Samuel McLendon, not to engage in their quarrels. After J. E. J. Hart and Hodges had been quarreling some time, Hodges started to pull off his coat, and "Price spoke to him, and told him to keep on his coat; that neither he nor they could get a fair fight." Hodges kept his coat on. J. E. J. Hart and three other friends of his pulled off their coats. "Hodges and Price kept backing out or off," Price saying that he could not get a fair fight. Whilst J. E. J. Hart and Hodges were quarreling, Sam. McLendon interfered, and told Hart that he should not fight Hodges. About that time Hart called his brother, Judge M. Hart, some three times before he made his appearance. When Judge M. Hart came into the yard, he and Price met very near witness. As soon as Judge M. Hart saw Price, he remarked to him that "no gentleman would act as he had done." Price asked him what he had done. Hart replied "that he had danced about the floor to the interruption of the dancers." Price denied it, and remarked: "Judge, I am not afraid; and as to fighting, you can't whip me." Judge M. Hart replied: "God d—n you, I can knock you down faster than you can get up." Price replied: "You are a d——d liar; and if you think you can whip me, pitch in." Hart stepped back so as to get room to strike, and struck Price, knocking him back

about ten feet. As soon as Price recovered, the parties met and commenced to fight; and they fought until they were separated. At the commencement of the fight, witness was near enough to the parties to have put his hand on them. He saw no knife, nor any attempt to draw one. It was a bright moonlight night. After the parties were separated, he saw J. E. J. Hart strike and kick Price, saying he wished he could kill him. Soon after this, Judge M. Hart called J. E. J. Hart to him and said: "You, Joe, are the cause of this; you are always raising difficulties at every gathering you go to except church." Witness stated further, that he and Judge M. Hart were friendly, but that he and J. E. J. Hart were unfriendly.

Samuel McLendon, for the defendant, stated that he was at Brown's party; was in the house whilst Price was there; saw Price sitting in a chair and shuffling his feet on the floor, as if keeping time with the music. After Price and J. E. J. Hart left the room, witness went out and found Hart and Hodges quarreling. Hart had his coat off, and was offering to fight Hodges. Witness interfered, and offered to take the fight off Hodges' hands, for the reason that Hart was too large a man to fight Hodges. J. E. J. Hart and three other men friendly to Hart's side had their coats off. When witness proposed to fight Hart for Hodges, J. E. J. Hart then called some three times for his brother, Judge M. Hart. When the latter came out, he and Price got into a quarrel. They were some ten feet apart. Witness does not recollect what they said; saw Hart knock Price back several feet. They then clinched, and commenced fighting. "Witness rushed in," and after they had fought some time, J. E. J. Hart came up and kicked Price twice, and struck him once. The parties again got to their feet, and fought until Judge M. Hart said he was cut, when they were parted.

This was all the evidence for the defendant.

The bill of exceptions recites: "Other witnesses were introduced on the part of the state, some three or four, to rebut what had been testified to on the part of the defense, whose testimony was substantially the same as that on the part of the state, except none testified to seeing the knife in the possession of Price on the night of the fight. Here the testimony closed."

On the hearing of the motion for a new trial, the bill of exceptions recites: " That the defendant introduced the instruction mentioned in said motion, to prove that said instruction had been given." This is all the statement in the record, except what appears in the motion itself, in relation to said instruction, or any other.

Defendant also proved that at the time the verdict of the jury was returned into court, and the jury discharged, he was not present in court, and " knew nothing of the verdict at the time it was returned." But it was shown that the counsel of Price was present in court when the verdict was returned, " but did not know of the absence of the defendant;" and that defendant was under recognizance to appear " at the present term of the court."

On the hearing of the motion in arrest of judgment, the defendant read in evidence the minutes of the court at a preceding term, from which it appeared that, on Saturday, the 6th day of March, A. D. 1858, he had been arraigned, and pleaded not guilty to the present indictment; and that the cause had been regularly submitted to a jury, duly empaneled, &c.; and that, after hearing the evidence, they retired to consider of their verdict; and on the same day they came into court and reported that they were unable to agree upon a verdict. " Whereupon the said jury was dismissed, and the cause continued."

And it further appeared from said minutes that the court met again on Monday, the 8th of March, 1858.

From the judgment of the court overruling these motions, and sentencing him to confinement in the penitentiary for two years, the prisoner sued out this writ of error.

W. P. Harris, for plaintiff in error, made the following points:

1. The proof was insufficient to convict of an intent to murder. Ex parte Wray, 1 George, 673; Cotton v. State, 2 ib., 504.

2. In criminal cases the verdict cannot be rendered in the absence of the prisoner; he has the right to poll the jury. People v. Perkins, 1 Wend., 91; 1 Arch. Cr. Pl. & Pr. (by

Waterman), 173, notes 1, 2; Kelly v. State, 3 S. & M. 518; Dyson v. State, 26 Miss. R., 383. The Revised Code allows this to be done only by consent of counsel. See p. 662, art. 303.

3. The court had no authority to discharge the jury at the March term, 1858. Commonwealth v. Clue, 3 Rawle, 498; State v. Ephraim, 2 Dev. & Batt., 162; U. S. v. Haskell, 4 Wash. C. C. R., 402; Commonwealth v. Cook, 6 Serg. & R., 377; People v. Alcott, 3 Johnson's Cases, 301; Mahala v. State, 10 Yerg. 535; Whar. Cr. Law, 206, 207.

4. The instruction objected to on the motion for a new trial, was erroneous.

*T. J. Wharton,* attorney general:

1. The instruction objected to cannot be noticed by the court; it was not excepted to on the trial. Haynie v. State, 32 Miss. R., 401; Brown v. State, ib., 434; Scott v. State, ib., 473.

2. The prisoner was under recognizance, and it was his own fault that he was not present when the verdict was rendered. It was his duty to be present in court, and he cannot take advantage of his own wrong:

3. As to the power of courts to discharge jurors, when they cannot agree, and the effect of such discharge, there is a great diversity in the authorities; but the following sustain the power, and hold that its exercise does not relieve the prisoner, and they seem to be most consonant to reason. People v. Olcott, 2 Johnson's Cases, 301; People v. Goodwin, 18 John. R., 200; State v. Bowden, 9 Mass. R., 494; State v. Wood, 12 ib., 313; State v. Woodruft, 3 Day's Cases, 504; State v. Barnett et al., 2 Caines' R., 100; State v. Denton, 2 Johnson's Cases, 275; U. S. v. Perez, 9 Wheaton, 580; State v. Green, 13 Wend., 56, 2 Pick., 521; Stone v. People, 2 Scam., 326; Moore v. State, Walker's R., 134; U. S. v. Gilbert, 2 Sumner, 19; U. S. v. Shoemaker, 2 McLean, 114; U. S. v. Haskell, 4 Wash. C. C. R., 409; Wharton's Cr. L. (2d ed.), 205–213; 1 Arch. Cr. Pl. (6 Am. ed.), 171–173.

HANDY, J. :

The plaintiff in error was indicted and convicted of an assault, with intent to kill and murder Judge M. Hart.

After verdict, the defendant below made a motion for a new trial, on various grounds, which was overruled. He then moved an arrest of judgment, which motion was overruled; and the case is brought here upon exceptions taken to the action of the court in overruling these motions.

The first ground of the motion for a new trial, and the first error assigned is, that the verdict is contrary to the law and evidence.

Many witnesses were examined, both in behalf of the State and of the accused; and though there is some discrepancy between the respective witnesses in some particulars, the entire testimony warranted the jury in taking the following view of the facts of the case : that the accused had, in the opinions of the persons charged with the management of the *ball* or party at which the offense was committed, been guilty of a breach of decorum, in consequence of which he was called out of the room, by one of the persons authorized to keep order, and an altercation took place between that person and the accused and a person associated with him; during which, the person who called the prisoner out, called several times to Judge M. Hart, who was also one of the managers, to come out into the yard where the altercation was going on; that Hart went out, and said to the accused, that he thought he was more of a gentleman than to have acted as he had done in the room, to which the accused replied, denying that he had acted as Hart had alleged; and Hart said : " Go into the house and get a partner, and act or dance like a gentleman." The accused denied that he had acted in an ungentlemanly manner; and Hart insisted that his conduct was wrong; and the accused then said Hart could not whip him; to which Hart replied, that " he could whip him or knock him down faster than he could get up;" and thereupon the accused said, with an oath, " You are a liar; and if you think you can whip me, pitch in," stepping up to Hart; at which Hart stepped back for room to strike, and struck the accused, knocking him back several feet; and

the parties then met, and struck about the same time, the accused striking overhand, and at the first blow he cut Hart on the cheek; and after they had fought for some time, they were separated; Hart was found to be cut twice on the arm, with two small marks on the neck, a large wound on the face, and his clothes cut in several places. Hart testifies that he did not see any knife in the hands of the accused, and other witnesses in his behalf state that they saw none; but another witness states that, at the time Hart struck the first blow the accused had his right hand in his bosom. Another witness testifies, that while the quarrel between Hart and the accused was going on, he saw the accused take out a knife and open it, and put it in his side-pocket in his coat, or some place in his clothes about his breast; and another witness testified that, after the fight had ceased, he found a large pocket-knife, a deadly weapon, having blood on it; and it was also proved, that about three weeks before the fight, the accused had in his possession a knife of the description of the one found upon the ground, and spoken of by the last witness.

There is but little discrepancy among the witnesses as to the commencement of the altercation between the accused and Hart, and as to what took place between them immediately preceding and connected with the fight; and whether the accused was guilty of the improper deportment in the ball-room complained of or not, the testimony justified the jury in believing that Hart was acting in a proper spirit in his first remarks to the accused, and from a desire to have decorum observed on the occasion. It is also clear that the accused first exhibited a hostile disposition, and gave the first invitation to fight, and made the first advance toward Hart, amounting to an assault, which immediately led to the conflict. The testimony also fully warranted the belief that he prepared and secreted his knife, to be used in the fight, and that he did use it in a manner most likely to take the life of his antagonist.

Under these circumstances, the jury were authorized to conclude that the accused brought on the fight, and was, therefore, responsible for the use of the deadly weapon; and if, as the jury were warranted by the facts in believing, he prepared and con-

cealed the knife before entering into the fight which he pro-
voked, with the determination to use it, if necessary, in the
fight, that was evidence of the malice, which, if he had killed
his antagonist, would have been murder.[1]   Roscoe Cr. Ev.,
738; Rex v. Kessal, 1 Carr. & P., 437; 2 Arch. Crim. Pl. & Ev.
(by Waterman), 224–1.   If the case be regarded as one of mu-
tual combat, it is evident that the accused entered into it at
unfair advantage, and having a deadly weapon, concealed about

[1] Rex v. Kerrall, 1 C. & P., 437.  In the case of Wray Ex parte, 30 Miss. R., 673, the
prisoner armed himself with deadly weapons, with the avowed purpose of seeking an
explanation from a school-teacher (who had expelled from his school a brother of the
prisoner), but declaring that he would not use them unless the school-boys should ren-
der it necessary by interfering against him; he soon afterwards met the teacher, when
hot words passed, and the prisoner struck the deceased with his fist, and the latter
thereupon assaulted the prisoner with great violence, and pursued him while he re-
treated; the prisoner then drew his weapon for the first time, and killed the deceased.
The court, per FISHER, J., held that the circumstance of arming himself, and going into
the struggle armed, together with the fact of his being fiercely assaulted by the deceased,
did not raise the presumption of malice sufficient to constitute murder.  HANDY, J.,
dissented from this opinion of the court, and, in very elaborate and masterly argument,
sustains the position which the court have taken in the case of Price *supra*.  He says:
"I take the rule to be sound and well established, that whenever a party, having pre-
vious malice, provides himself with deadly weapons, intending to use them, if neces-
sary, in a conflict, *and he provokes the conflict*, and uses the weapons, and kills his ad-
versary, it is clearly murder.  Roscoe Cr. Ev., 724. * * * * * But it is said that
the killing is extenuated, because in the conflict he was hard pressed by the blows of
the deceased, and only resorted to his weapon to defend himself against the fierceness
·of his adversary's blows; that the killing must be regarded as the result of that *furor
brevis* produced by the violence of the assault upon him, and cannot be ascribed to the
original malicious purpose shown by his conduct."  The true doctrine on this subject is
laid down by Roscoe thus:  'It frequently becomes a most important question, in the
proof of malice, whether the act was done under the sudden influence of such a degree
of provocation as to reduce the crime from murder to manslaughter.  The indulgence
shown to the *first transport* of passion in these cases, says Mr. Justice Foster, is plainly
a condescension to the frailty of the human frame, to the *furor brevis*, which, while the
frenzy lasts, renders the man deaf to the voice of reason.  The provocation, there-
fore, which extenuates in the case of homicide must be something that the man is
conscious of, which he feels and resents at the instant the fact which he would ex-
tenuate is committed, or what time and accident may afterwards bring to light.
Whenever death ensues from sudden transport of passion, or heat of blood, *if upon a
reasonable provocation* and *without malice*, or if upon a sudden combat, it will be man-
slaughter; if without such provocation, or if the blood has had time to cool, or *there be
evidence of express malice*, it will be murder; *for in no instance can a party killing alle-
viate his case by referring to a previous provocation, if it appear by any means that
he acted upon express malice.  When the provocation is sought by the prisoner, it cannot
furnish any defense against the charge of murder.*'"  Roscoe Cr. Ev., 724; State v. Hill,
4 Dev. & Batt., 491.  " To save the party making the first assault, upon an insufficient
legal provocation, from the guilt of murder, the occasion must not only be sudden, but
the party assaulted must be upon an equal footing in point of defense, at least, at the
outset."  Roscoe, 738; Wharton's Am. Cr. Law, 950, 953; State v. Lane, 4 Iredell, 113;
1 Hale, 451; State v. Ferguson, 2 Hill's S. C. R., 619; Wharton on Homicide, 38, 180,
197; Jones v. State, 14 Mo., 409; Roberts v. State, 14 Mo., 138; State v. Johnson, 1
Iredell, 354; State v. Tilley, 3 Iredell, 424; Stewart v. State, 1 Ohio, 66; State v. Mar-
tin, 2 Iredell, 101.

his person, ready for use, and which he did use. It is immaterial in such a case who gave the first blow; for the party challenged to fight is warranted in believing that his adversary will fight without the use of deadly weapons, unless such weapons are open to view, and so exhibited as to put him on his guard that they will be resorted to. The rule in such cases is, that "if a party enters into a contest dangerously armed, and fights under an undue advantage, though mutual blows pass, and kills his adversary, it is not manslaughter, but murder." [1] Per Bailey, J., in Whiteley's case, 1 Lewin C. C., 173; Roscoe Crim. Ev., 739; Archb. Crim. Pl. & Ev., 224.

It is therefore manifest that the jury were justified in considering the conduct of the accused as dictated by malice, and without justification; and there is no just ground for this assignment of error.

The next ground for a new trial, and which it is here insisted should have been sustained, is, that the verdict was returned into court by the jury while the defendant was absent, and the jury was discharged before it had an opportunity to poll the jury.

In support of this ground of the motion, the record shows that it was proved that, at the time when the verdict was returned into court, and the jury was discharged, the accused was not present in court, and knew nothing of the verdict, though his attorney was present at the time; and that the defendant was under recognizance to appear at that term of the court. It also appears that the accused was present in court at the commencement of the trial.

The general rule is, that the verdict, in cases of felony, must be delivered in open court, and in the presence of the defendant. 1 Chitty Cr. L., 636. This rule is founded on two reasons: First, the right of the defendant to be present, and to see that the verdict is sanctioned by all the jurors; and, secondly, in order that the defendant, if convicted, may be under the power of the court, and subject to its judgment. The right of the defendant to be present depends upon the presumption that he is in custody, and has no power to be present unless ordered

---

[1] See cases cited in note (*) *supra.*

by the court to be brought into court. But, under our law, he may waive that right. If he is not in custody, so as to be deprived of the power to attend, it would seem that the reason of the rule as to his right to be present would fail; for he is voluntarily absent when he ought to be present, and cannot complain of the consequence of his own voluntary act. His voluntary absence must be taken to be a waiver of his right to be present. But, upon another view of the circumstances of this case, he cannot be heard to take any advantage of his absence when the verdict was rendered. He was present in court when the trial was commenced, and when the case was put to the jury; and though under recognizance of bail before that time, for his appearance to answer the charge brought against him, he was no longer at liberty, but was in custody of the law. If he afterwards withdrew from the court, or escaped, so as not to be present at the return of the verdict, it is by his own unlawful act, of which he should not be permitted to take advantage. His absence must be considered, at least, as a waiver of his right to be present; and his own legal act should not be permitted to thwart the process of the law to his advantage.

Hence, though the verdict in his absence was irregular, so far as his being present, and in the power of the court, to submit to its judgment, yet no prejudice was done to his rights, and he can take no benefit from his own illegal act.

We, therefore, think that this ground of error was properly overruled.

The next error relied on as ground of reversal is, that at the term previous to that at which this verdict was found, the court discharged the jury when there was no necessity, and without the consent of the accused.

This objection was taken in the court below, upon motion in arrest of judgment; and, in support of it, it was shown by the record that the court held over another day after the jury was discharged, at the previous term, and that the jury were discharged because they were unable to agree.

The question of the power of the court to discharge a jury in criminal cases, without the consent of the defendant, is one in which great contrariety of opinion exists in the courts of this

confederacy, and of the several. states; the rule, on the one hand, being held, that the discharge of the jury, without the defendant's consent, or unless for reasons of plain and absolute necessity, amounts to an acquittal, because of the constitutional protection to the defendant against being put twice in jeopardy of life or liberty; and, on the other hand, the rule held being that the power to discharge is a matter within the sound discretion of the court, to be exercised whenever the ends of public justice require it; and that the exercise of the power in any given case is not a bar to a subsequent trial and conviction. The former rule is held by the courts of Pennsylvania, Virginia, North Carolina, and Tennessee, and the latter rule is held in the Supreme Court of the United States, and in Massachusetts, New York, Kentucky, Illinois, and in this state, and also by the United States Circuit Courts.[1] Wharton's Amer. Cr. Law, 206, *et seq.*, and cases there cited.

[1] The cases on this point may be divided into two general classes: 1st. Where any discharge of the jury, except in cases of violent necessity, is held a bar to all subsequent proceedings. 2d. Where it is held that the discharge of the jury is a matter within the sound discretion of the court; and that when, in the exercise of a sound discretion, it takes place, it presents no impediment to a second trial. The first view has been taken by the courts of Pennsylvania, Virginia, North Carolina, Tennessee, and, to a certain extent, of Alabama. The cases in Pennsylvania where this position is maintained are Com. v. Cook, 6 Serg. & Rawle, 577 ; Com. v. Clue, 3 Rawle, 498; Peiffer v. Com., 3 Harris, 468 ; but see McCreary v..Com., 24 Penn. St. R., 323 ; Com. v. McFadden, 11. Harris, 12.. In Virginia, mere inability in the jury to agree is not such a necessity as will justify the court in discharging them. Williams v. Com., 2 Grattan, 568. The same opinion is held in North Carolina. State v. Carrigues, 1 Hay., 241; Spear's case, 1 Devereaux, 491. On this point, the courts of South Carolina, Indiana, and Alabama have ruled differently. Powell v. State, 19 Ala., 577; Wright v. State, 5 Ind., 290 ; State v. McLemore, 2 Hill S. C., 680. In the case of State v. Waterhouse, 8 Yerg., 278, the supreme court of Tennessee,. Peck, J., dissenting, held that it was discretionary in the court, even in capital cases, to discharge the jury ; but in Mahala v. State, the court unanimously held that the inability of the jury to agree upon a verdict did not justify a discharge by the court. It was out of the power of the court, it was said, to discharge them without consent, *except in case of sickness, insanity, or exhaustion among themselves.*

In Alabama, the following may be said to be fully established: That courts have not, in capital cases, a discretionary power to discharge a jury, after evidence given. 2d. That a jury is *ipso facto*, by the determination of the authority of the court to which it is attached. 3d. That the court does possess the power to discharge, in any case of pressing necessity, and should exercise it whenever such case is made to appear. 4th. That sudden illness of the prisoner or a juror, so that a trial cannot proceed, are ascertained cases of necessity, and that many others exist, which can only be defined when particular cases arise. 5th. That a court does not possess the power, in a capital case, to discharge a jury because it cannot or will not agree. 6th. That such discharge operates as an acquittal. Ned v. State, 7 Porter, 188; State v. Abram, 4 Ala., 272.

2. The Supreme Court of the United States and the appellate courts of Massachusetts, New York, Maryland, Ohio, Indiana, Missouri, Illinois, Kentucky, and Mississippi, have held that the discharge of a jury by the court, in the exercise of a sound

We consider the latter rule as founded in the better reason, and more just and convenient in its operation. As to the expediency of such power lodged in and exercised by the court, the views of the Supreme Court of the United States appear to be sound and convincing. "We think," say that court, "that in all cases of this nature, the law has invested courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances which would render it proper to interfere. To be sure, the power ought to be used with great caution, under urgent circumstances, and for very plain and obvious causes; and in capital cases, especially, courts should be extremely careful how they interfere with any of the chances of life in favor of the prisoner. But, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound, and conscientious exercise of this discretion rests in this, as in other cases, upon the responsibility of the judges under their oaths of office." United States v. Perez, 9 Wheat. 579.

As to the objection that the party is protected by the constitution from being twice put in jeopardy, it appears to be clear that the sense of the constitution is, that no man shall be a second time put upon trial for the same offense after having been once tried, and either convicted or acquitted of the same offense. People v. Goodwin, 18 John. R., 187; U. S. v. Haskell, 4 Wash. C. C., 409. And there is great force and truth in the language of Mr. Justice Washington in the case last cited, in which he meets the objection founded on the constitu-

discretion, is no bar to a second trial. In the Supreme Court the following cases are relied on : United States v. Haskell, 4 Wash. C. C., 409 ; U. S. v. Gilbert, 2 Sumner, 19; U. S. v. Coolidge, 2 Gall., 364 ; U. S. v. Shoemaker, 2 McLean, 114 ; U. S. v. Perez, 1 Wheaton, 579. The decisions in those states maintaining this position are, Com. v. Bowden, 9 Mass., 194 ; Com. v. Purchase, 2 Pick., 521 ; People v. Goodwin, 18 John., 187 ; People v. Olcott, 2 Johns., 301 ; Sheppard v. People, 11 E. P. Smith, 407 ; Hoffman v. State, 20 Md., 425 ; Moore v. State, 1 Walk., 34 ; Josephine v. State, 39 Miss., 613 ; State v. Stone, 2 Scam., 326 ; Dobbins v. State, 14 Ohio St., 493 ; State v. Nelson, 26 Ind., 366 ; State v. Walker, ib., 346 ; Com. v. Olds, 5 Little, 140 ; Const. Mo., art. 11, § 10 ; 3 Story on Const., 660 ; 1 Tuck. Black., App., 305.

tional privilege in question. "The moment," says he, "it is admitted that in cases of necessity the court is authorized to discharge the jury, the whole argument for applying this article of the constitution to a discharge of the jury, before conviction and judgment, is abandoned; because the exception of necessity is not to be found in any part of the constitution, and I should consider this court as stepping beyond its duty in interpolating it into that instrument, if the article of the constitution is applicable to a case of this kind. We admit the exception, but we do it because that article does not apply to a jeopardy short of conviction."

In this case the reasons and circumstances upon which the court acted, in discharging the prior jury, do not appear; and as the court had the power to do the act, we must presume that it rightly exercised it. This ground of error, therefore, cannot be maintained.

The last error relied on is the rule of law stated by the court to the jury in relation to the question of malice.

It appears that no exception was taken or reserved, at the time, to this instruction; nor does it appear that the instruction was, except by the recital in the motion for a new trial. It is not even set forth or stated by the court in the bill of exceptions taken to the overruling of the motion for a new trial. It is, therefore, clear that it cannot be regarded as a part of the record. It is embraced by the rule held in Haynie v. The. State, 32 Miss., 400, and is much more clearly not a part of the record than the instructions in that case.

We think there is no error in the record, and the judgment must be affirmed.